ORIGINAL

1   JEHAN ZEB MIR, MD Pro-se
2   417 VIA ANITA
    REDONDO BEACH, CA 90277
3   Telephone No.: (310) 373-4029

FILED

JUL 11 2014

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA
# SAN DIEGO, CALIFORNIA 92101

| | |
|---|---|
| **JEHAN ZEB MIR,MD** ) | Case No.: **12 CV 2340-GPC-DHB** |
| Plaintiff, ) | |
| vs. ) | |
| **KIMBERLY KIRCHMEYER** ) | |
| In Personal and Official Capacity as ) | |
| Interim Executive Director, Deputy Director ) | |
| & Executive Director Medical Board of ) | **THIRD AMENDED COMPLAINT** |
| California ) | **FOR PERMANENT OBJECTION** |
| ) | **& DECLARATORY RELIEF** |
| **LINDA K.WHITNEY** ) | |
| In Personal Capacity as ) | |
| Executive Director, Medical Board of ) | |
| California ) | |
| ) | |
| **SHARON LEVINE, M.D.** ) | |
| In Personal & Official Capacity as ) | |
| President, Medical Board of California ) | |
| ) | |
| Defendants ) | |
| ) | |
| ) | |

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 1

## PARTIES

### Plaintiff

(1).The Plaintiff is a resident of the County of Los Angeles, State of California and holds a current, unrestricted, active medical license issued by Commonwealth of Pennsylvania since 1974.

### Defendants:

(2) The defendant Kimberly Kirchmeyer is sued in her personal, individual and official capacity as past interim Executive Director; past Deputy Director and as Executive Director of the Medical Board of California, Department of Consumer Affairs which maintains a District Office at 4995 Murphy Canyon Road, Suite # 203, San Diego, CA 92123 and has its main office located at 2005 Evergreen St. Suite # 1200 Sacramento CA95815.

(3) Defendant Kirchmeyer has been with the Medical Board since 1999 and in the position of deputy director from 2005 to 2009 and then from June 2011 to June 6, 2013 when she was appointed interim Executive Director of the Medical Board of California and was later confirmed as the Executive Director of "MBC". Her address is 2005 Evergreen Street, Suite # 1200, Sacramento, CA 95815.

(4)  Kimberly Kirchmeyer supervises licensing, investigations, issues accusations, provides for disciplinary hearings for physicians and enforces the decisions of the medical board of California and issues public notices on disciplined physicians and notifies hospitals and other medical boards of any disciplinary actions taken against physicians. She is primary liaison between 15 board members, representing Board on statewide and National issues.

(5) Kimberly Kirchmeyer **participated** and was **personally** involved with Plaintiff's disciplinary matters alleged herein particularly in 2006, after ALJ issued her Proposed Decision on March 3, 2006, Plaintiff spoke on telephone with Kirchmeyer and discussed with her the ALJ's Decision and informed her that he was denied due process when no hearing was allowed on the Second Amended

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 2

Accusation and new findings on documentation were inserted into the Decision without a notice, accusation, hearing and proof. That the charge of misdiagnosis was false and fraudulent and admissions by "MBC"'s experts that Plaintiff made the correct diagnosis were excluded from the ALJ's Proposed Decision. That ALJ could not recommend any penalty based on making of one wrong diagnosis, as the ALJ Proposed Decision provided that there was no penalty for single act of negligence. Based upon these facts, Plaintiff requested and Kirchmeyer granted STAY and Reconsideration of the ALJ's Decision.

(6) Subsequently, in December 2006 and thereafter, Kirchmeyer **participated** and was **personally involved** with 2006 Decision of revocation, particularly its enforcement and dissemination of information on "MBC" website; to National Data Bank and to other medical boards in State of New York and Commonwealth of Pennsylvania where Plaintiff held medical licenses in good standing since 1974.

(7) Kirchmeyer **participated** and was **personally involved** with post remand proceedings at the medical board from 2007 to 2008, when Plaintiff was revoked for the second time. Kirchmeyer **participated** and was **personally involved** with 2008 Decision of revocation, its enforcement and dissemination of information on "MBC" website; to National Data Bank other medical boards in State of New York and Commonwealth of Pennsylvania where Plaintiff held medical licenses.

(8) From 2011 to August 2012, Kimberly Kirchmeyer **participated** and was **personally involved** in the enforcement of 2010 Decision by the "MBC", and publication of such information on "MBC" website; its dissemination to National Data Bank and other medical boards in State of New York and in the Commonwealth of Pennsylvania.

(9) From August 2012 to present Kimberly Kirchmeyer **participated** and was **personally** involved with 2012 Decision of revocation, its **enforcement** and dissemination of information on 'MBC" website ; to National Data Bank and medical boards in the State of New York and Commonwealth of Pennsylvania.

Plaintiff is requesting relief from **prospective enforcement** of revocation of medical license and reinstatement of medical license.

(10). Defendant Kimberly Kirchmeyer is sued her in her **Official capacity** for relief against **prospective** enforcement of Order of revocation and for prospective reinstatement of medical license.

(11) Defendant Kimberly Kirchmeyer is also sued here in her personal individual capacity for prospective relief against prospective enforcement of Order of revocation and for prospective reinstatement of medical license.

(12) Defendant Kimberly Kirchmeyer is also sued in personal and individual capacity for **retrospective relief** against past constitutional violations for denial of fair hearings and repeatedly disobeying the order, writ and interlocutory judgment of the superior court and then the Court of Appeals 3rd to re-determine penalty consistent with the findings of the superior court on writ petition pursuant to California Code of Civil Procedure § 1097, instead in order to injure Plaintiff recycled their set aside and vacated Decision disregarding the findings of the court on writ petition, and retaining their dismissed findings because Defendants could not lawfully determine any penalty after dismissal of several findings by the court including improper transfer of patient which converted 'repeated acts of negligence and repeated acts of incompetence' to single act of negligence. Defendants admitted in their Decisions there was no penalty for single act of negligence. However, Plaintiff never made a wrong diagnosis. Plaintiff has not ever made a wrong diagnosis and no one else ever accused Plaintiff of making a wrong diagnosis. On the other two grounds that Plaintiff made a false statement and on new documentation findings / inserted into the Decision without a notice, accusation, hearing or proof, Plaintiff never had any hearing and furthermore, Plaintiff never made the alleged false statement and there were no documentation deficiency. Plaintiff requests retrospective reinstatement of medical license without probation as of 2010.

(13) The defendant Linda K. Whitney is sued in her personal, individual capacity as the Executive Director of the medical board of California. She was responsible for supervising licensing, investigations, issuance of accusations, disciplinary hearings for physicians and enforces the decisions of the medical board of California and notifies public and other medical boards of any disciplinary actions taken against physicians.

(14) Linda Whitney **participated** and was **personally** involved with the Plaintiff's disciplinary matters alleged herein particularly the enforcement of "MBC"'s 2008 and 2010 Decisions and dissemination of information on "MBC"'s website; to National Data Bank and medical boards in State of New York and Commonwealth of Pennsylvania.

(15) On November 3, 2011 Defendant Linda K. Whitney personally prepared, signed and filed Petition to Revoke Probation without serving upon Plaintiff. She filed Petition to revoke Probation while Plaintiff's writ petition was still pending in the state court and long before Corrected 2010 Decision on third remand was filed on March 16, 2012.

(16) On or about August 16, 2012, Defendant Linda K Whitney acting upon her own Petition to Revoke Petition personally signed Order revoking Plaintiff's Medical License without Notice or Hearing. On June 1, 2013 Whitney retired from the Medical Board of California located at 2005 Evergreen Street, Suite # 1200, Sacramento, CA 95815. Plaintiff is informed and believe that Whitney moved to Island of Hawaii. Plaintiff inquired her counsel to be provided her current address to be included in the Third Amended Complaint and also the fact that defendant Whitney should apprise court of her current address, the counsel did not respond to the request for her current address.

(17).The defendant Sharon Levine, M.D. is sued in her personal, individual capacity and in her official capacity as the President of the medical board of California. Her address is 2005 Evergreen Street, Suite # 1200, Sacramento, CA

95815. She was the member of the hearing panel which held disciplinary hearing against Plaintiff Jehan Zeb Mir, MD and heard oral arguments held on July 27, 2010. She unreasonably and in contempt of the court's order placed Plaintiff on probation. She is responsible for licensing, investigations, issuing accusations, providing hearings, disciplining physicians, enforcing disciplinary actions and notifying public, hospitals and other medical boards about any disciplinary actions taken against physicians.

(18) Defendant Sharon Levine is sued in her official capacity for prospective relief against prospective enforcement of Order of revocation and for prospective reinstatement of medical license.

(19) Defendant Sharon Levine is sued in her personal, individual capacity for prospective relief against prospective enforcement of Order of revocation and prospective reinstatement of medical license.

(20) Defendant Sharon Levine is sued in her personal, individual capacity for retrospective relief against past constitutional violations of repeated denial of fair hearings; false fraudulent charges; extrinsic fraud for charging and denying a hearing on Second Amended Accusation and inserting false, frivolous findings on documentation without a notice, accusation, hearing or proof into her 2010 Decision and in direct violation and direct disobedience of the court orders and retrospective reinstatement of medical license without probation as of September 2010.

## JURISDICTIONAL ALLEGATIONS

(21). Plaintiff brings this action under [1]42 U.S.C. § 11112 and pursuant to [2]42 U.S.C. ξ 1983 to secure equitable relief from actions initiated by defendants under

---

[1] 42 U.S.C. § 11112 jurisdiction exists as Defendants have violated the provisions of fair hearing.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 6

². 42 U.S.C. § 1983 jurisdiction is based on denial of fair hearing by Defendants and on the ground that defendants were biased against Plaintiff as fully factually alleged in the body of the SAC and caused delay. The defendants are incompetent for 'bias' to hold a hearing or render any decision, the Younger Abstention does not apply. ( *Gibson et al. v Berryhill et al.* 411 U.S. 564; 93 S. Ct. 1689; 36 L. Ed. 2d 488; 1973 U.S. LEXIS 74) and as listed below:

1. Arbitrarily excluded evidence or declined to consider, appraise and rule on Admission by their expert that Plaintiff made the correct diagnosis and that of the two possible diagnoses there was no evidence supporting Defendant's diagnosis.
2. Denied a hearing requested pursuant to *Cal. Gov. Code* § 11506 altogether on New Charges inserted into Second Amended Accusation in violation of *Cal. Gov. Code* § 11506 (c) and *Cal. Govt. Code* § 11516.
3. Denied hearing altogether on New Charges /findings on Documentation inserted into Decision without a notice, accusation, hearing or proof in violation of *Cal. Govt. Code* 11506 (c) and *Cal. Gov. Code* § 11513 (b).
4. Included Prosecutor into deliberations in making 2006 Decision.
5. Disobeyed order, writ and interloculatory judgment of superior court on writ petition by declining to re-determine penalty consistent with the findings of the superior court on writ of administrative mandamus. Recycled word by word ,paragraph by paragraph, page by page its set aside and vacated 2006 Decision as 2008 Decision and unlawfully inserted findings of ' repeated and gross negligence' which had not been upheld by superior court on writ petition. This was done to justify penalty which the Defendants could not determine based on 'single act of negligence' of allegedly making a wrong diagnosis as admitted by Defendants in their 2006, 2008 and 2010 Decisions.
6. Caused delay of one year on remand just to recycle 2006 Decision as 2008 Decision and without providing a hearing or oral arguments or without a hearing officer presiding.
7. By denying impartial decision makers when on 2008 remand hearing included panel members from 2006 Decision makers whose decision had been set aside and vacated by superior court in 2007. The 2008 hearing was not presided by a hearing officer in violation of *Cal. Gov. Code* § 11517 (a) and (b) (1).
8. Denied hearing and Oral arguments in 2008 Decision making process in violation of Cal. Govt. Code § 11517 (c)(2) (E) (ii) as was found by California Court of Appeal 3rd in its February 22, 2010 Decision.
9. Declined to consider evidence of mitigation in redetermination of penalty in 2008 Decision and against their policy of progressive discipline revoked straight off without any evidence of prior discipline.
10. Declined to provide hearing on constitutional claims of discrimination in 2008.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 7

State law that violate of rights, privileges, and immunities guaranteed him by the United States Constitution, and directly under and through Article 1, Section 10, Clause 1 and the Fourteenth Amendment to the United States Constitution.

11. Declined to provide hearing or dismiss on one remaining Charge of making false statement on remand in 2008 Decision.

12. Declined Request for Reconsideration of 2008 Decision requested pursuant to *Calif. Govt. Code* § 11521.

13. Disobeyed order of California Court of Appeals 3rd to obey the 2007 order, writ and interloculatory judgment of the superior court pursuant to California Code of Civil Procedure Section 1097 to re-determine penalty consistent with the findings of the superior court on writ petition.

14. Repeatedly recycled word by word, paragraph by paragraph, page by page its set aside and vacated 2006 Decision and 2008 Decision as 2010 Decision and unlawfully inserted findings of 'repeated and gross negligence' which had not been upheld by superior court on writ petition as well as by the Court of Appeal 3rd providing that dismissed finding of improper transfer of patient by superior court on writ petition changed the legal and factual basis of the 2008 Decision. This was done in order to justify penalty which the Defendants could not otherwise determine based on 'single act of negligence' of allegedly making a wrong diagnosis as admitted by Defendants in their 2006, 2008 and 2010 Decisions. By doing so, Defendants violated California Court of Appeals 3rd order that **remand was limited** to redertermination of penalty consistent with 2007 findings of the superior court i.e. not to make any findings.

15. Denied fair hearing by not appointing impartial decision makers when biased Decision makers from 2006 hearing panel and 2008 hearing panel whose decisions had been set aside and vacated by the courts were included in the 2010 hearing panel.

16. Determined probation and $ 40,000 a year penalty for cost of probation, monitoring on Charge of one false statement without hearing and bootstrapped documentation Charges into decision without notice hearing or proof.

17. Denied Reconsideration of 2010 Decision requested pursuant to *Cal. Govt. Code* § 11521.

18. On August 19, 2012 Defendants revoked without a Notice or a Hearing in violation of California Government Code § 11505 (c).

19. Caused impermissible delay of 7 years by flaunting the Decision of the state courts and preventing a final judgment on merit.

20. Defendants in retaliation filing writ petition ordered psychiatric examination and turned original order of revocation of medical license for two years into eight (8) years of revocation.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION  -  8

The Court has original jurisdiction to entertain this cause of action pursuant to the provisions of 28 U.S.C. § 1343 and [3]28 U.S.C. § 1331)

## COMMON ALLEGATIONS

**STATEMENT OF FACTS:**

**BACKGROUND:**

**Plaintiff is University Highly Trained, Double Board Certified Surgeon with No Prior Disciplinary Actions or Malpractice Judgments or Settlements in the past 52 Years.**

(22) Plaintiff since 1972 had been continually registered and licensed by the California Medical Board, Department of Consumer Affairs State of California as a Doctor of Medicine and Surgery without any disciplinary actions before or after the current events complained herein. Plaintiff has also been continuously licensed by the Commonwealth of Pennsylvania in good standing since 1974. In March 2008, the Pennsylvania Medical Board after review of the 'administrative record of the hearing before medical board of California and briefing by Plaintiff, dropped 'referral proceeding' based upon 2006 Decision by medical board of California and renewed, active, current, unrestricted medical license. The Pennsylvania Medical Board also rejected the 2007 Decision of the superior court ordering remand. Plaintiff had held a license in good standing by State of New York till January 2013 when the N.Y. medical board in a referral proceeding based on Defendant's August 19, 2012 decision, revoked without a notice or a hearing.

(23).Plaintiff prior to that date, completed his internship at **Elizabeth General Hospital, Elizabeth N.J.**, a year of general surgical residency at **St. Clare's Hospital, N.Y, N.Y** 10019 and three years of General Surgery Residency Training

---

[3] . The jurisdiction to grant Injunctive Relief is no different or separate from jurisdiction granting Declaratory Relief which itself is based on findings and relief requested for Injunctive Relief and is not limited to or based upon 'diversity'.

at **NYU /VA.-Hospitals N.Y.,N.Y.**10010 and completed his one year Thoracic & Cardiovascular Surgery Residency Training at **Children Hospital of Los Angeles,** 90017 (USC); **Good Samaritan Hospital, Los Angeles** California and one year as Chief Resident, Cardiovascular & Thoracic Surgery at **University of Pennsylvania Medical Center Philadelphia** PA 19104.

(24) Plaintiff honorably served more than 3 years in US Navy, as **Commander** and Surgeon, and had a 13 month tour of duty as **Trauma Surgeon in Vietnam** from January 1969 to March 1970.

(25). Plaintiff is **certified by American Board of Surgery** since 1970 and was twice **Re-certified by the American Board of Thoracic Surgery**, in the years 1993 and 2003 for 10 years. Plaintiff **never paid any settlements or judgments in any malpractice actions** in the past 52 years in the medical profession and no actions are currently pending as of December16, 2013. ([4]12 AR 0010; 170 AR 3594-3617; R.T. 10/21/2004, *Mir,* p.112, line 10-p.135, line 17; 67 AR 1664-1681)

(26).Plaintiff **never had any disciplinary action** against him since his state licensure in 1972 by any medical board or any hospital till the events described herein.

**Plaintiff Obtains $ 600,000 Surgical Contract:**

(27).In 2000, Plaintiff was a provisional member of the medical staff a Pomona Valley Hospital, Pomona California ) hereinafter "PVH") and was working under the direct supervision of the hospital and its active staff members/ surgeons for *any diagnosis* and *treatment* on all *elective or emergenc*y patients admitted by him including any pre-*operative, intra-operative and post-operative care.* Any diagnosis or plan of treatment including surgery must be approved by the hospital approved proctor before provisional physician provides any treatment as required

---

[4]   AR is reference to the Administrative Record of hearings held before California Medical Board filed in the Sacramento County Superior court, is cited by Volume No. followed by letters **AR** and then by the page number. Plaintiff has lodged the Administrative record with the district court.(Dockett # 29)

1  by 'PVH' Medical Staff Bylaws and Department of Surgery Rules & Regulations.(

2  27 AR 739) (28AR 1078-1083;t651102-1106 ; 71 AR-1773-1777)

3  **81 Year Old Woman Presents With Multiple Medical Problems & Cold Blue**

4  **Toes Right Foot At the Emergency Room on June 8, 2000.**

5  (28) On June 8, 2000, an eighty one (81) year old obese woman ("GF") was

6  transferred from the nursing home to the San Antonio Community Hospital

7  Emergency Room with complaints of cold blue toes right foot at 7.00 a.m. Patient

8  appeared to have suffered **Stroke** because she could not talk and had prior history

9  of severe **Essential Hypertension, Arteriosclerotic and Hypertensive Heart**

10  **Disease; Tachyarrhythmia** and **Chronic Renal Failure** with an elevated **BUN of**

11  **28.**The EKG showed **Left Atrial Enlargement.**

12  (29) At **3.00 p.m.** Plaintiff was contacted for the first time by the ER physician.

13  Patient ("GF") had undergone an ultrasound and a brain scan ordered by the E.R.

14  Physician.

15  **Ultrasound Showed Brain Infarcts & Obstruction Superficial Femoral**

16  **Artery:**

17  (30). The Ultrasound examination showed obstruction of Right Superficial

18  Femoral Artery. The brain scan showed several areas of **old infarcts,** probably due

19  to emboli. (clot originating elsewhere)

20  **Arteriogram Shows Clot at the Bifurcation of Femoral Artery:**

21  (31).Plaintiff ordered an Angiogram [arteriogram) to be done by the Staff

22  Radiologist in the radiology department. The Angiograms showed **shadow of a**

23  **clot** sitting at the bifurcation of [Common][5]Femoral Artery **("CFA")** and a long

24

25  [5]  **Anatomy :**

26   The main artery originating from the heart is aorta, which continues in the chest and abdomen
    and divides into right and left Common Iliac Artery at the level of navel.
27

28  The **Common Iliac Artery** divides into two branches, an **Internal Iliac Artery** which supplies
   organs within the pelvis and an **External Iliac Artery** which continues into thigh and its name

segment of complete calcified occlusion of mid- Superficial Femoral Artery

(**"SFA"**) surrounded by **numerous collaterals**. Just couple of inches below the

complete "SFA" obstruction, there was another complete obstruction of the

**popliteal artery,** which is a direct continuation of "SFA". Significantly, there was

no blood flow through the other 'profunda' branch of Femoral Artery from its

origin at bifurcation of "CFA", where the clot was noticed. There were others

arteries such as the Right Internal iliac artery and top of blocked right mid-"SFA"

and left "SFA" where shadows of clots were also noticed, indicating recurrent

emboli.

### Plaintiff Makes Diagnosis of Embolic Clot Blocking Circulation:

(32) Plaintiff took history and performed physical examination and found **a**

**bounding pulse** in the area of bifurcation of Femoral Artery in the groin with

**complete abrupt absence of** pulse just below it, signifying an Acute Blood Clot or

Embolus blocking the blood flow and the blood flow and pressure trying to push or

break the clot down, manifested by a bounding pulse—a classic textbook

diagnostic sign of 'Embolism on physical examination" This was further

confirmed by the findings on the Angiogram done by the Radiologist.

### Plaintiff Admits Patient to San Antonio Community Hospital:

(33) Plaintiff **admitted** the patient ("GF") to the San Antonio Community

Hospital, <u>wrote an Admission Note,</u> particularly stating in the [6]Past History,

---

changes to Femoral Artery at the level of groin. (AKA, erroneously as Common Femoral
Artery," CFA" which is an archaic term.)

About two inches below the groin, [Common] Femoral Artery gives off a branch called
Profunda Femoris Artery ("Profunda") and continues as Superficial Femoral Artery ("SFA").

The Superficial Femoral Artery at the lower third and on the inner aspect of thigh courses to the
back and its name changes to Popliteal Artery which then bifurcates at the lower margin of knee
joint into Anterior and Posterior Tibial arteries supplying the front and back of the leg
respectively. (**18** AR 00695-698)

[6] This Past History was <u>*not*</u> obtained by any of other three physicians who attended the patient.

**surgery for varicose veins** in 1950's, hysterectomy; history of smoking and she had worked as a cashier in Rome, NY and documented a diagnosis of 'Thrombo-Embolism". (thrombus meaning clot; embolism –moving from one area to another within the blood downstream) (42 AR 1277, 1278) (76 AR 1841-1842)

**Plaintiff Could Not Schedule Emergency Surgery & Transfers:**

(34) Plaintiff admitted the patient to the Hospital and wrote an 'Admission Note' and tried to schedule the patient for emergency surgery at San Antonio Community Hospital, Upland, CA and was informed that he could not do the case till 11.30 p.m. because other surgery was going on and they had no anesthesiologist. Plaintiff contacted neighboring Pomona Valley Hospital, Pomona, CA and was informed that they were not busy and Plaintiff could bring his patient. The primary care physician documented that fact in his history and physical dictated on that day at Pomona  Valley Hospital after transfer. (56 AR 1466- History by Dr. Newandee)

**Hospital Investigates Need  for Transfer & Arranges  for Transfer:**

(35) **Plaintiff explained to the family** that patient needed emergency vascular surgery and time was the essence to restore circulation and it was imperative that he transferred the patient to Pomona Valley Hospital at the earliest. That sooner patient was transferred patient, sooner he would be able to begin treatment. **The family agreed to transfer**.

(36) Plaintiff called the nursing supervisor at San Antonio Community Hospital and informed the need for transfer and to make arrangements for transfer. Patient ("GF") belonged to the Hospital and Plaintiff could not just remove the patient.

(37) The nursing supervisor investigated the need for transfer and called the O.R. on telephone in the presence of the Plaintiff and confirmed that surgery indeed could not be done immediately and made arrangements for transfer. Patient had both Medicare and Medi-Cal which is universally accepted by all Hospitals and physicians and Plaintiff had no financial motive in transfer. On the contrary,

Plaintiff would have to travel to another Hospital, generate paper work and wait for protocol and basic laboratory tests to be completed.

(38) Since patient had both Medicare and Medi-Cal and **the hospital is required by law to attest and certify that the transfer is necessary and that such services cannot be performed at the transferring hospital** in order to prevent patient dumping, duplication of services and charges and payment by Medicare. Such certification is required by law for Hospital and everyone else including ambulance services to get paid by Medicare.

**Plaintiff has Difficulty Finding a Willing Proctor:**

(39) At Pomona Valley Hospital, Plaintiff obtained written consent from the daughter of the patient("GF") because patient was mentally incapacitated, for **Embolectomy, Intraoperative Angiograms and a Femoro-popliteal bypass graft** as an [7]*ancillary procedure to aggressively improve blood flow in order to combat prolonged ischemia* of more than twelve (12) hours well beyond the permissible time period for recovery of circulation and prevent damage to the tissues.(56 AR 1469-consent for surgery 6/8/00)

(40) Plaintiff as a provisional staff member encountered great difficulty in finding an assistant/ proctor. Dr. Lau was on call in the Hospital ER for Vascular Surgery declined to proctor and finally on the third call agreed to assist and proctor on the

---

[7] At the Hearing (infra) Plaintiff provided evidence from the medical literature that femoro-popliteal bypass can be done as an *Ancillary Procedure* during ' Embolectomy '. (4 AR 50)

That the golden period to restore circulation is six hours after acute circulatory occlusion before irreversible ischemic injury takes place (3 AR 25) that Plaintiff was first contacted by ER about 8 hours after the discovery of symptom at about 7.00 am by the nurses at the nursing home. That the angiograms were completed by about 5.30 pm. (76 AR 1824, 1833).That patient was transferred to Pomona Valley Hospital at about 8.00 pm. (56 AR 1461) and the surgery could not be started till about 10.00 pm. due to difficulty in finding a willing proctor. (56 AR 1471)

That patient had a complete obstruction of mid superficial femora artery ("SFA") and femoro-popliteal bypass would have aggressively increased blood flow to aid in the reversal of prolonged ischemia and 'ischemic injury'. That femoro-popliteal bypass was not intended for the 'board's diagnosis of 'acute thrombosis of SFA". (4 AR 50)

1   condition that since he was on call in the ER, he could not tie himself down to a

2   long case, and that he could proctor only the 'Embolectomy' and not the' Femoro-

3   popliteal bypass." (20 AR 729)

4   **Plaintiff Removes Embolic Clot At Surgery:**

5   (41) The OR nurses would not bring a patient from the ward to the OR, unless the

6   proctor was physically present in the OR. Once the proctor Dr Lau arrived Plaintiff

7   performed Embolectomy and removed the offending clot an '***Organized***

8   ***Thrombus' at the bifurcation of femoral artery, with fresh secondary clots***

9   ***distally***. This finding of two generation of clots ,old and young, new, fresh is

10  specific **and a classic diagnostic evidence of 'Embolism '** at surgery and is fully

11  documented in the operative report. (56 AR 1475)

12  **Operative Findings Confirmed Findings on Physical Examination &**

13  **Arterigram to Support Diagnosis of Embolic Clot:**

14  (42).The operative findings confirmed the findings on physical examination and

15  the **Arteriogram** done by the Radiologist at San Antonio Community Hospital and

16  EKG finding of **Enlarged Left Atrium** where such clots are routinely formed and

17  ejected periodically into circulation. (56 AR 1475, 1476, 1482)

18  **Pathologist Confirms the Diagnosis of Embolic Clot:**

19  (43)The Pathologist described the Organized Clot removed as  a'*laminated clot'*

20  i.e. layers of clot successively laid over period of time in some secluded place,

21  such as enlarged heart chamber or within an arterial aneurismal sac. (56 AR 1477)

22  **Circulation is Completely Restored in the Affected Leg:**

23  (44).The surgery was a complete success with full restoration of pulses, color,

24  temperature and capillary filling, as documented by several nurses and two other

25  physicians who attended the patient. There was no need to do an [8]angiogram or a

---

26  [8] . Angiograms are fraught with great danger since it requires injection of nephrotoxic radio-

27  opaque dye. Patient was dehydrated and just had had a large dose of nephrotoxic radio-opaque
    dye administered for pre-op. angiograms done by the radiologist with patient' s  elevated BUN of

28  28,showing pre-existing damage and a failing kidneys.

Femoro-popliteal bypass, as the patient was brought back to same status as it existed before the event occurred. (56AR 1480, 1481, 1485, 1486, 1524)

**Plaintiff Complains to Chief of Surgery for Improper Conduct of Proctors:**

(45).On Friday, June 9,2000, the very next day, Plaintiff complained to Chief of Surgery , Dr. Disney in a letter and documented the above facts, particularly emphasizing that delay in starting surgery due to **lack of cooperation of proctors** which almost injured his patient.

(20 AR 729) (33 AR 1161)

**Patient Suffers Recurrent Embolic Clots At a Different Location:**

(46). Patient ("GF") did fine for two days then on Saturday June 10, 2000, at 4 .00 pm. suddenly developed same symptoms. (26) Plaintiff was contacted by the nurse on first call and he made a diagnosis of "Recurrent Thrombo-Embolism" and immediately ordered to place patient on N.P.O. and to get the ready the patient for surgery and ordered a fresh consent for E*embolectomy, Intraoperative-Angiogram and a Femoro-popliteal bypass graft*, as it was ordered on June 8, 2000 (56 AR 1509, 1519, 1526(160AR 2795)

(47) There was difficulty in contacting the daughter to obtain consent by phone by the nurses for several hours, in spite of nurses repeatedly calling and leaving messages on the voice-mail  system as was well documented in the nurses' notes.

**Plaintiff Encounters Problems in Finding Proctor Again:**

(48). Plaintiff once again encountered great difficulty in finding a willing proctor. Dr. Vinod Garg agreed to assist and proctor but informed Plaintiff that he could only *stay* for embolectomy and not for the Femoro-popliteal bypass because his young daughter was having some sort of a *party* and that he had to be there. (21 AR 732) (33 AR 1161)

---

The Defendants' experts alleged and charged that intra-operative angiogram should have been done **to re-diagnose complete obstruction of "SFA" which had been diagnosed on preoperative** arteriogram by Radiologist and was confirmed at surgery as documented in the operative note.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 16

**Plaintiff Removes Clot from Common Iliac Artery & Restores Circulation Again:**

(49) Plaintiff once again removed an *'Organized Thrombus'*, **with fresh clots distally.** This was also documented by pathologist as *laminated clot* (56 AR 1534), diagnostic of thrombo-embolism.

(50) That time the occlusive clot was located at a different much higher location than the prior episode on 6/8/00, at the **bifurcation of Common Iliac Artery** within the abdomen and once again **succeeded in restoring pulses confirmed** before the closure of the operative wound and patient was removed from the operating table.

(51) The recovery ,however was not as dramatic as after the first surgery, because there was another serious *delay* of more than *six hours* but this time due to complete cessation of blood flow in the leg caused by a higher occlusion at Common Iliac Artery, which was well above all collateral blood flow to and within the leg (six hours is generally the golden period to reverse ischemia before irreversible tissue injury takes place) because as stated above the daughter of the patient could not be contacted by repeated phone calls by nurses to obtain consent. (56 AR 1509) because the patient continued to be obtunded since before the first surgery and could not give informed consent

(52). The leg was not expected to *warm up* right away after repeated, prolonged bouts of ischemic insults *[even a kettle on a stove would take time before it starts whistling]* However, **the nurses following surgery documented pulse by Doppler in the right foot till the morning of Monday, June 12, 2000.** (56 AR 1541, 1546) (56 AR 1519, 1532, 1533, 1534, 1540)

**Dr. Garg at the Bedside Following Surgery:**

(53).Following surgery, the recovery room nurse's notes show that Dr. Garg was on the bedside at about 11.30 pm. on Saturday, June 10, 2000. (56 AR 1537)

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 17

**Plaintiff Cannot Find a Willing Proctor to Re-Explore Artery on Sunday June 11,2000:**

(54) On Sunday June 11, 2000 since the recovery was not as dramatic as the first surgery, Plaintiff tried to look for a assistant/proctor, including the Chief of Surgery Dr. Disney and Chief of Staff to re-explore the artery to rule out formation of any additional clots within the artery. (35) Plaintiff was unsuccessful to find anyone and could not perform surgery. Plaintiff could not document the unavailability of these individuals in the medical record for exposing everyone to medical liability creating enemies, since such *peer review issues* are protected from discovery under *California Evidence Code § 1157* and every hospital requires a confidentiality of peer review agreement as a requirement of staff membership. That that could be viewed as a hostile, disruptive act on part of Plaintiff.

**Nurses Notes Show Plaintiff Aware of Condition of Patient on Sunday:**

(55).The June 11, 2000(Sunday) nurse's notes show that Plaintiff was informed about the condition of the patient ("GF") and Plaintiff told the nurse that *he was aware of the condition of the patient.* That patient would '*probably*' be going to surgery on Monday. June 12, 2000.as he was not sure, if he would ever be able to find anyone to assist and proctor him even on Monday June 12, 2000 and he did not want to commit himself and the Hospital to the family. **(56 AR 1545)**

**Dr. Garg not Responding to Several Call by Nurses on Sunday:**

(56) The nurse's notes on Sunday June 11, 2000 also show that Dr. Garg was [9]**repeatedly contacted** by the nurses about the condition of the patient and he **was not available,** as was experienced by the Plaintiff the same day when he tried to contact him. The nurses contacted him because he the proctor appointed by the

---

However, the Defendants' experts admitted that intra-operative angiogram' would not be needed for Plaintiff's diagnosis of 'Thrombo-embolism'.

[9] At the Hearing (infra) Dr. Garg denied that

Hospital to supervise care of the patient ("GF") and to correct any deficiencies in care according to hospital medical staff bylaws.

**Pulses in the Foot Still Documented on Monday:**

(57) On the Monday morning June 12, 2000 the nurse  documented that pulse in the right foot was faintly audible by Doppler.(56 AR 1546)(160 AR 2799)

**Dr.Garg Not Willing to Proctor Emergency Surgery till All of his Surgeries Done:**

(58)On June 12, 2000 at 10.00 a.m. Plaintiff contacted Dr. Garg once again to assist and proctor. Dr. Garg[10] told him that he would assist and proctor only after he was done with his long line of cases. Finally Dr. Garg finished his long line of cases and surgery was started at 10.00 p.m. causing another 12 hours further delay and additional ischemic injury. (56 AR 1577, 1578)Plaintiff had to **wait at the hospital all day till midnight before he could complete surgery** and go home.

**Plaintiff Removes Recurrent Embolic Clots at  Another Location ;Performs Intraoperative Arteriogram ;Femoro-popliteal Bypass & Again Restores Circulation Again, Documents with Post bypass Intraoperative Arteriogram the Sufficieny and Success of the Procedure:**

(59) Plaintiff **first performed intra-operative angiograms** below the right knee to assess 'run-off' [open vessels or circulation], as the preoperative angiograms done by the radiologist on 6/8/00, did not show any' run-off'' below the right knee. A distal run –off was essential to assure blood outflow or open channels below knee before a Femoro-popliteal bypass could be expected to perform successfully.

(60) During hearing the medical board did not know why the intra-operative angiogram was done, showing a complete lack of understanding of the disease process or the nature of the problem at hand.

(61) Upon documentation of satisfactory 'run-off' by intra-operative angiogram, an **Embolectomy and a Femoro-popliteal bypass** was performed. A post bypass

---

[10]   At the Medical Board hearing (infra) Dr. Garg denied that.

<u>Intra-Operative Angiograms</u> documented blood flow across the distal graft-vessel anastomosis and blood flow heading all the way down to the ankles. (56 AR 1561, 1579-1581)

**Operating Room Nurse Tested Pulses on Doppler in the Presence of Dr. Garg Who Could Hear Pulses on Operating Room Speaker Systems:**

(62) Operating room Nurse Ramirez who had worked at the Pomona Hospital since 1963 testified at the Medical Board hearing that on June 12, 2000 before the patient was transferred from the operating room table to a gurney, for transport to recovery room, **pulses were heard by Doppler amplified by speaker system in the operating room in the presence of Dr. Garg.** (175 AR 4463-4494) The testing of pulses before transferring patient from the operating room to gurney prior to transport to recovery room is a **standard practice**. That if pulses are not heard or felt, the surgeon is notified and if he does not take action, an incident report is made.

**Recovery Room Nurse Documents Pulses & Normal Capillary Filling in the Foot:**

(63) Recovery Room Nurse documented by Doppler **normal pulses, color and temperature** and a **normal capillary filling**, which is the ultimate, most sensitive test of tissue viability at the cellular level.

**Patient Developes Gangrene Foot. Dr. Garg Refuses to Proctor Amputation:**

(64) On June 14, 2000, patient's leg developed gangrene. Dr. Garg refused to proctor the amputation. Plaintiff complained to him, that, had the proctors been cooperative and not causing delay, his patient ("GF") would be going home on that day instead of having her leg cut off. Plaintiff was able to obtain another proctor for the procedure.(56 AR 1602, 1603, 1604, 1605)

**Gastroenterolgist Places Feeding Tube:**

(65) The patient ("GF")did fine following above knee amputation and was **discharged alive and well,** however required a 'Gastrostomy' by a

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION – 20

gastroenterologist for her **failure to feed herself due to her stroke related difficulty in swallowing** and **mental incapacity**.

**Dr.Garg Prepares Two Proctoring Reports A Week after When He Learns that Patient Developed Gangrene:**

(66) On June 18, 2000, eight (8) days after his assisting and proctoring first surgery Dr. Garg allegedly prepared two proctoring reports, for two surgeries done on June 10, 2000 and June 12, 2000 where proctors are required to complete the proctoring reports immediately at the conclusion of surgery. These reports were never shown to Plaintiff and were protected from discovery under *Evidence Code § 1157*. (85 AR 1980; 86 AR 1983)

**Department of Surgery Considers Dr. Garg's Proctoring Reports & Takes No Adverse Action;**

(67) In September 2000, these proctoring reports were considered by the Department of Surgery and Plaintiff was removed from proctoring in General and Thoracic Surgery, but was continued on proctoring in Vascular Surgery, apparently because he had attended only one vascular surgery patient.

**Plaintiff Obtains a $ 600,000. A Year IPA Surgical Contract:**

(68) In September 2000 Plaintiff obtained a $ 600,000 IPA surgical sub -contract.

**"PVH" Gets the Chart Reviewed by a Different Committee Which Also Clears the Chart:**

(69) In October 2000, the Pomona Valley Hospital *reopened* the case (GF). Plaintiff complained to the Invasive Procedures Surgery Committee, **in writing that there was delay and proctors did not want to *stay* for the Femoro-politeal bypass** to be performed that the **delay contributed to the adverse outcome.** (21 AR 732)(33 AR 1161)

(70) On November 7, 2000, Plaintiff appeared before the Invasive Procedures Surgery Committee. **Dr. Garg was also present** at the meeting **and said nothing** to complaints by Plaintiff of him not *staying* at the surgery on June 10, 2000.

(71) The Invasive Procedures Committee did not find any wrong doing on Plaintiff's part and made no findings and closed the matter.

**"PVH" Summarily Suspends Vascular Surgery Privileges Interfering With Contract:**

(72) On November 13, 2000, the Chief of Staff, a staff Radiologist at Pomona Valley Hospital and Chief of Surgery Dr. Disney summarily **suspended Plaintiff's Vascular Surgery privileges** without giving any reasons.

**Plaintiff Requests Injunctive Relief by California Superior Court:**

(73) Plaintiff requested Injunctive Relief in the superior court on the grounds that he would suffer **irreparable harm** because summary **suspension was illegal** under California Business & Profession Code **Section 809** , requiring '**imminent danger** ' to the life or health to an individual and Plaintiff could not possibly be a danger 'imminent' or otherwise to any patient  because he was **working under the direct supervision** of the hospital and its proctors, and the patient  had been discharged alive and well six months earlier and that **he had no patients in the hospital facing any imminent danger.** The "PVH" opposed on the ground that Plaintiff had not exhausted administrative remedies. The superior court denied relief because Plaintiff had not exhausted administrative remedies first.

**"PVH" in Retaliation Terminates From Hospital Staff; Declines to Provide "Acts or Omissions":**

(74) In retaliation for filing Complaint for Injunctive Relief, the hospital terminated Plaintiff from the medical staff.  Plaintiff requested reasons for suspension / termination'. The hospital refused to provide 'acts and omissions' in violation of its medical staff bylaws and California Business & Profession Code.

**Plaintiff Files Complaint for Declaratory Relief:**

(75) Plaintiff filed an action for Declaratory Relief for courts to declare his **rights under medical staff bylaws** and California Business & Profession Code and point specific California case law (***Rosenbilt v Superior Court***)(1991) 231 Cal. App.3[rd]

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION  – 22

1434 ) providing notice of charges including 'acts and omissions' to the physician facing discipline to enable defense, is a due process requirement, under 14th Amendment of the Constitution. That a Physician is not left guessing charges at hearing.

(76)That Plaintiff could not wait to exhaust administrative remedies which the Hospital can  deliberately delay and leisurely prolong hearings for years and then if Plaintiff gets it reversed on writ petition, the Hospital would appeal to court of appeal and Supreme court taking few more years and then if he prevails on appeals, he would have to go through another hearing process starting at square one [as it happened to Dr. Rosenbilt, *supra*] lasting few more years, then another cycle of writs and appeals will ensue while the Plaintiff is prevented from practicing at the hospital.

(77) That the action of the "PVH" will be reported under California Business & Profession Code Section 805 to other hospitals where Plaintiff had been on good standing for over 25 years and these hospitals can take their own action interfering with his livelihood everywhere resulting in most severe form of **irreparable harm,** where the court could just order Hospital to provide 'acts or omissions' which would end the matter right there and would also best serve the best interest of judicial economy)

(78)The superior court denied relief again because **Plaintiff had not exhausted administrative remedies**. The California Court of Appeal also denied relief on the Injunctive and Declaratory Relief on the same ground.

**"PVH"Terminates Hearing Before Ever Getting Started:**

(79)  Before the Court of Appeal's Decision, became final the **hospital terminated hearing** which never got started when Plaintiff objected to delaying and harassing, irrelevant discovery request from a hospital where Plaintiff was on staff 25 years earlier and removed Plaintiff from the medical staff and reported to Defendants under Business & Profession Code Section 805, without providing any 'acts or

1   omissions' to the medical board in its Complaint under Section 805. This was in

2   violation of California decisional law. (***Rosenbilt v Superior Court***

3   **Disciplinary Proceedings:**

4   (80) On September 10, 2002, defendants' managers interviewed Plaintiff. The

5   interviewing physician Dr. Jerry Wu in his report stated that Plaintiff made a diagnosis

6   of thrombo-embolism in his preoperative note," From **reading Dr. Mir's pre-**

7   **operative note**, one gets the impression that Dr. Mir's working diagnosis was

8   embolism superimposed on thrombosis involving right lower extremity" ( 41 AR

9   1239).

10   The **only preoperative note** prepared by Plaintiff was the **'Admission No**te' he had

11   written at the San Antonio Community Hospital.

12   (81)Plaintiff took the "Admission Note" with him to "PVH" to save time for writing

13   another note at "PVH" and instead attend emergency at hand.

14   (82) Plaintiff made the blessed error that he took the original "Admission Note" with

15   him instead of the copy of the "Admission Note" to "PVH" because the medical board

16   in its First Amended Accusation falsely charged that Plaintiff had fraudulently

17   prepared the "Admission Note" and had planted it both in the medical records at

18   "PVH" and San Antonio Community Hospital <u>as fully alleged below</u>.

19   (83) The Defendants produced false testimony from one Desiree Steward working at

20   medical record department at the  San Antonio Community Hospital that copy of the

21   "Admission Note " was not present in the medical records maintained at San Antonio

22   Community Hospital. This was after medical records department upon Plaintiff's

23   request had certified the medical records which contained the "Admission Note".

24   (84) The defendants somehow succeeded in not only producing false testimony but

25   also managed to have the copy of the "Admission Note " removed from the records at

26   San Antonio Community Hospital.

27   (85) The day was saved because the original "Admission Note "was present at the

28   records at "PVH" which the Defendants could not remove. Had the original

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION – 24

"Admission Note" been left at San Antonio Community Hospital, the defendants would have had field day in proving its false charges.

**Defendants Bring False Fraudulent Charge of 'Misdiagnosis'.**

(86) On August 21, 2003, Defendants filed the 'Accusation'. (103 AR 2091)

(87) The [11]central charge in the Accusation was that Plaintiff made a wrong diagnosis of 'Thrombo-embolism' Right Femoral Artery, instead of Defendants' diagnosis of '[12]Acute Thrombosis of mid-Superficial Femoral Artery'. The charge was false and fraudulent because 'Acute Thrombosis of Superficial Femoral Artery' is a theoretical diagnosis, because it causes no symptoms (**AR 00054**-"Peripheral Embolization and Thrombosis' William Mackey, p.p. 341-354) because this event takes place at the end of chronic, long standing occlusive atherosclerotic process allowing development of

---

[11] The other charges were:

(1) Plaintiff did not provide the **treatment of 'Acute Thrombosis of mid-"SFA by doing an Intraoperative Angiogram and a femoro-polpiteal bypass"** on June 8,2000

(2) that he **did not use Saphenous vein for bypass graft.**

(3) He placed the lower end of the prosthetic graft between two arterial obstructions be in the "SFA" and Popliteal Artery.

(4) **Improperly transferred patient** from San Antonio Community Hospital to Pomona Valley Hospital.

(5)Documentation charges: **Failing to document history and physical.**

The Defendants' experts **speculated** that the mid-"SFA" was almost occluded due to long standing atherosclerotic process and it just so happened that on morning of admission to ER, on June 8, 2000, the mid –"SFA" became completely occluded, thus causing symptoms without any evidence to support such a  hypothesis.

side channels the collateral blood vessels bypassing obstruction and supplying blood flow, as was the case in this patient and testified by Board's experts.

(88) The Defendants in its Accusation relied on the consultation by Dr. Joshua Bardin (61 AR 1640) and Dr. Deck. (64 AR 1652) These experts never saw, examined the patient, saw the *angiograms,* performed any surgery; examined the pathologic specimen, the '*Organized Clot*' or **laminated clot** as described by Pathologist removed at surgery, or referred to report by the pathologist or provided any pre or post-operative care and, yet they made the correct diagnosis, even though Dr. Bardin wrote in his consultation report that **angiograms were critical** to making a diagnosis, yet he made the correct diagnosis without seeing the angiograms.

(89) Few weeks after writing his accusatory consultation, Dr. Joshua Bardin wrote to medical <u>board that he had then seen Angiograms and his opinion on charge of</u> <u>'misdiagnosis'</u> remained the same.(62 AR 1648)

**Plaintiff Repeatedly Calls Prosecutor to Drop Charges**

**Because Charges Made No Medical Sense:**

(90) Plaintiff personally repeatedly called Defendants' prosecuting attorney on several occasions to drop the Accusation, because it made no medical sense, and offered to meet board's experts in order to resolve the matter .The Defendants showed no interest whatsoever.

**Defendants Conduct A Sham Hearing:**

(91) The Defendants' hearings were held from October 18, 2004 to April 6, 2005, for a total of 'thirteen one day session. The **hearing was a sham** because the **entire hearing was focused on reading of the arteriograms** done before surgery where Plaintiff had performed the surgery and had actually removed the offending embolic Clot causing symptoms from within the artery corresponding to area of obstructing clot visualized on angiogram fully documented in the operative report and by the pathologist in his report which had repeatedly confirmed the diagnosis with pathologist's physical description of embolic clot as a **'laminated clot'.**

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION – 26

(92) The Defendants' experts falsely testified that intra-operative angiogram should have been done during surgery to **re-diagnose complete obstruction of "SFA" which had already been diagnosed on ultrasound in the E.R. and by the radiologist on the arteriograms completed just 4 hours before surgery**, and further reconfirmed on exploration of the artery at surgery and was fully documented by Plaintiff in the operative report dated June 8, 2000 Defendants'

**Experts Testify That There is No Evidence Supporting Defendants' Diagnosis:**

(93) The Defendants' experts first contended that **angiograms were crucial to diagnosis** yet made the diagnosis of 'Acute Thrombosis of "SFA' without seeing the Angiograms.

(94) After the Defendants' expert Dr. Bardin saw the angiograms apparently for the first time at the hearing, he testified **that a clot may be present at bifurcation of femoral artery, but he was not sure**, that **he could not make any diagnosis on Angiograms either of 'Thrombo-Embolism 'or of 'Acute Thrombosis of "SFA'** (**168** AR 3218, R.T., 10/18/04, *Bardin*, p. 80,line 22-25) (**170** AR 3502, R.T.10/21/04, *Bardin*,p.20 , line 15-20)

(95). Defendants' Rebuttal witness Radiologist Dr. Bigoni, testified **that clot could be present at the bifurcation of[Common] Femoral Artery** that there was *no blood flow* through the "Profunda" branch of Femoral Artery, thus proving the cause effect relationship and supporting Plaintiff's diagnosis of Embolism.

**Prosecutor Introduces False Testimony and A False Document:**

(96) In order to rehabilitate the testimony of Dr. Bardin, that there was no blood flow through 'Profunda' which supported Plaintiff's diagnosis, the Defendant called Dr. Kenneth Deck to testify. Before his testimony, a Defendants representative an official came to personally thank Dr. Deck for his [false] testimony. The reason for this expression of special gratitude from medical board became apparent when Dr. Deck falsely testified that 'Profunda' was open by falsely pointing to another vessel the

Lateral Circumflex Artery as the 'Profunda' contrary to testimony of five other experts.

(97) Plaintiff has taught Anatomy in medical school and knows from personal knowledge that no first year medical student could possibly ever confuse between these two vessels because 'Profunda' a much larger vessel heads downwards and a smaller  Lateral Circumflex Artery heads laterally at 90 degree angle to 'Profunda' artery.

(98) The pattern of falsehood soon became apparent when on cross –examination it was discovered that Defendants had **introduced a false and fabricated document, Dr. Deck's curriculum vitae falsely indicating that Dr. Deck was certified by Vascular Surgery Boards**, when he was not certified by any surgical board at all.

**Defendants' Expert Dr. Bardin Admits that Plaintiff Properly Placed Graft Below Second Obstruction in the Artery Showing that He Had not Seen Angiograms When He Wrote Accusatory Consult and also 3 Weeks Later When He Wrote that He Did View the Angiograms:**

(99).Dr. Bardin after viewing the intraoperative post femoro-popoliteal bypass graft angiogram admitted that Plaintiff had properly placed the graft <u>correctly</u> below the second arterial  obstruction in the Popliteal Artery instead of between the *two* obstruction in "SFA" and the Popliteal artery, as was charged in the Accusation.

(100) Dr. Bardin wrote his accusatory consultation charging that Plaintiff made the wrong diagnosis without looking at the angiograms when he also wrote that angiograms were critical to making the diagnosis. He then three weeks later falsely wrote to the medical board that he had seen the angiograms which he had not and continued to allege that his opinion remained unchanged.

(101) The Accusation was based on Dr. Bardin's consultation and he testified at the hearing that he could not make any diagnosis on angiograms done before surgery by the radiologist which ended medical board's case.

**Defendants' Expert Dr. Bardin Makes up Another False Charge on Spot:**

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION – 28

(102)Finding himself cornered, Dr. Bardin on the spot made up a **new charge** that Plaintiff had placed the lower end of the graft above another obstruction in the Anterior Tibial Artery branch of the Popliteal Artery which resulted in no flow through the graft and its closure **contrary to the pathologic examination of the amputated leg** which had **shown no such obstruction** in the Anterior Tibial Artery and, which had also shown that the **lower end of the graft was placed correctly below the obstruction in the Popliteal Artery,** instead of above it and also below the obstruction in the "SFA" further disproving the utterly false allegations in the 'Accusation' that Plaintiff had placed the lower end of the graft between two arterial obstructions which the defendant knew all along.

(103) This obstruction in the Anterior Tibial Artery was ruled out by the Defendants' own Rebuttal witness Radiologist Dr. Bigoni.

**Plaintiff's Experts See Clot Within the Artery on Angiogram:**

(104) Plaintiff's three experts testified that **angiograms showed a clot sitting at the bifurcation** of right femoral artery, **with no blood flow through 'Profunda',** which caused symptoms, because the other branch "SFA" had a long standing chronic occlusion due to atherosclerotic process and, when the offending *'Organized Clot'* blocking the " profunda " artery was removed at surgery , the blood flow was restored through 'profunda' artery  into the right leg with resulting restoration of patient's pulses temperature, in the foot, thus proving a cause and effect relationship. Plaintiff has shown the same angiograms to 12 year olds playing in the streets who had no difficulty in noticing filling defect in the Femoral artery which the Defendants' experts could not see.

**Defendants' Experts Fail to Explain Why Pulses Restored After Surgery if Plaintiff Made the Wrong Diagnosis:**

(105) The Defendants' experts could not explain why there was improvement of circulation, by return of pulses, color, temperature, venous and capillary filing in the leg after surgery if Plaintiff had indeed made the wrong diagnosis and had provided

the wrong treatment. Defendants first had the burden to prove the correctness of its diagnosis, of 'Acute Thrombosis of mid "SFA" yet it produced nothing in support of its diagnosis, other than speculation and falsehood.

**Defendants' Experts Admits That Plaintiff Made The Correct Diagnosis:**

(106) On *Cross- examination*, the Defendants' expert made the following admissions which were dispositive of the charge of 'misdiagnosis' in favor of Plaintiff. Defendants experts admitted that

(1) That they had no evidence for the Board's diagnosis of 'Acute Thrombosis of mid-Superficial Femoral Artery" because they had no prior x-rays showing that the mid-"SFA" was open on the morning of June 8, 2000, the day of ER admission. ( **170** AR 3509, R.T.10/21/05, p.27, line 19- AR 3510, p. 28, line 3)

(2) That any such 'occlusion' whether acute or chronic could *not* have caused symptoms due to another second complete (100%) occlusion of Popliteal artery, just below the obstruction in the "SFA" (**168** AR 3184, R.T.10/18/05, p 46, line 14- AR 3185, R.T. p.47, line 7; AR 3202, R.T.10/18/05, p.64, line 18-20; **171** AR 3844, R.T.11/08/05, p.193, line 11-21)

(3) That there are only two diagnoses which could have possibly caused symptoms. That the Plaintiff's' diagnosis of 'Embolism' was far more prevalent (75-90%) than the Defendants' diagnosis of 'Acute Thrombosis of SFA'(**168** AR 3189, R.T.10/18/05, *Bardin* p.51, line 9- AR 3190. R.T.10/18/05, p. 52, line 22)(**168** AR 3290, R.T.152, *Bardin* p.152, line 16-21)

(4). That the old clot, *'Organized thrombus'* which Plaintiff removed at first surgery at the bifurcation of femoral artery (56 **AR** 1477, 1534,1582) and then at the second surgery at a different and higher location had the characteristics of an 'embolic clot' and such clot could not have been caused by the 'Acute Thrombosis of SFA'.( **169** AR 3429,R.T.10/20/04, *Deck*, p.108, line 20-AR3431, p.110, line 6) (**170** AR 3491,R.T.10/21/04, *Bardin* , p. 9,line 15- AR3492, p.10, line 9) (**170** AR 3499, R.T.10/21/4, *Bardin*,p.17, line 9-21)

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION  -  30

(5) Plaintiff's diagnosis of embolism at the bifurcation of SFA was possible based upon plain reading of the angiograms. (**181** AR 5398, R.T. 4/6/05, *Bigoni,* p.93, line 15-18; AR 5416, p 111,p. 10-12 )

(6).That Plaintiff's treatment for his diagnosis of 'embolism' was correct, that Patient would not need a femoro-popliteal bypass - the treatment for Defendants' diagnosis of 'Acute Thrombosis of SFA. (**168** AR 3201, R.T.10/18/05, p. 63, line 7-25)(**168** AR 3224, R.T.10/18/05, 86, line 18-24)(**168** AR.3230, R.T. 10/18/05, p. 92, line 18-21) (**168** AR3232,R.T.10/18/04, p. 94, line 6-9) or an intra-operative arteriogram (**168** AR 3312, 3313 R.T.10/18/04, *Bardin*, p.174, line 22-p.175, line 8(**170** AR 3519, R.T.10/21/05, p. 37, line 4-22)

(7). That Plaintiff placed the graft correctly below the second complete obstruction of Popliteal artery instead of between *two* complete obstructions in the Popliteal artery and the mid-"SFA", as was charged in the 'Accusation'.

(8).That there were other areas like right internal iliac artery, mid –distal portion of SFA in the arteriogram where embolic clots could be possible.(evidencing recurrent emboli)(**181,** AR 5394,R.T. 4/6/5, *Bigoni* p.89,line 19, 20; AR 5421, R.T. 4/6/5, *Bigoni,* p. 116, line 12-16 ; AR 5423, p.118,line 22 –AR 5424 p.119, line 3*)* (**168** AR 3278, R.T. 10/18/04; *Bardin*, p 140, line 1,2 (41)

**Defendants File First Amended Accusation:**

(107).By the end of first day of hearing, it became abundantly clear that Defendants had no case. Thereupon, the Defendants started a campaign of delay, harassment and character assassination and hearing lasted another 12 one day session and in bad faith filed First Amended Accusation (**52** AR 01418)( **124** AR 02187)

**Defendants Conduct Campaign of Character Assasination:**

(108) The Defendants had charged in Accusation that Plaintiff **had not performed History and Physical Examination** and that he **had not** used Saphenous Vein for femoro-popliteal bypass graft. The hand written **Admission Note was the History**

1  **& Physical** which had also provided that in 1950s **patient had varicose vein**

2  **surgery,** which **removes Saphenous Vein,** thus defeating both charges.

3  (109) Plaintiff prepared the Admission Note at the San Antonio Community Hospital

4  ER and _fortunately_ by mistake took it with him the original "Admission Note" to

5  Pomona Valley Hospital, instead of taking a copy of Admission Note with him and

6  leaving the original Admission Note at San Antonio Community Hospital.

7  (110) Plaintiff took the Admission Note with him so that he would not have to spend

8  time to write another note at "PVH" instead of attending the emergency. Plaintiff

9  afterwards provided copy of the 'Admission Note' to medical records department at

10  San Antonio Community Hospital.

11  **Defendants Falsely Charge that Plaintiff Fabricated 'Admission Note'.**

12  (111) The Defendants tried to kill two birds with one stones and on November 8, 2004

13  charged in the **First Amended Complaint** ( 52 AR 1418) that

14  1. A. Plaintiff created a false document, an Admission History & Physical, introduced

15  at hearing, in the San Antonio Community Hospital records as Exhibit Q and falsely

16  testified he had created the document at the time he treated patient Grace F. That he

17  falsely testified the document was in San Antonio Community Hospital records and

18  yet the alleged 'Admission History and Physical' document is not in the certified copy

19  of these records.

20  B. Plaintiff falsely created the documents and dishonestly placed it in the records he

21  produced at hearing, Plaintiff's Exhibit Q.

22  He attempted to certify" the document as part of records by placing a false

23  Certification of the Custodian of records in Exhibit Q

24  C. Plaintiff falsely testified about the facts surrounding the creation of the 'Admission

25  History and Physical 'document.

26  D. Plaintiff falsely documented in the "Admission History and Physical" and testified

27  at hearing the patient had prior varicose vein surgery and had numerous scars from

28  that surgery on her leg. (**160** AR 2940, 2941)

**Everyone Had The Admission Note But Not The Defendant Medical Board.**

(112)Everybody else had the 'Admission Note' except the Defendants. Their own Consultant Dr. Jerry D Wu, MD who interviewed Plaintiff referred to the Pre-operative note in his Report, dated May 14, 2002 (**41** AR 01237)

(113)The Medical Records Personnel at Pomona Valley Hospital testified that the original 'Admission Note' (37 AR 1199) (76 AR 1841, 1842) was always present in the medical records of Pomona Valley Hospital and Plaintiff had no access to the medical records.

(114) It is simply not conceivable that Pomona Valley Hospital made copies of more than 400 pages of the medical records for the Defendants and the only page the copying machine failed to copy from the medical records copied for the Defendants was the two sided one page 'Admission Note'.

**Prosecutor Produces False Testimony to Show That Plaintiff Planted Admission Note into Medical Records at San Antonio Community Hospital:**

(115)After the Accusation was served, Plaintiff in August 2003 went to San Antonio Community Hospital to review the **arteriogram**. Plaintiff also reviewed the **medical records** and noticed the copy of the 'Admission Note' in the medical records.

(116) Plaintiff requested and was provided with copy of the medical records prepared by Desiree Stewart of the "SAC" Hospital Medical Record Department. Some of the pages were two sided and Plaintiff requested to make single sided copies of the two sided pages.

(117)  On October 11, 2004, before the hearing started, Plaintiff took 2003 copy of medical records to Desiree Stewart so that she could compare with the original records maintained at the hospital Medical Records Department and certify as an authentic copy, so that Plaintiff could introduce it at the hearing.

(118) Desiree Stewart apparently compared the records while Plaintiff sat in the office of Cynthia McLean, Director Medical Records waiting for Desiree Stewart to complete the work on the request and Desiree Stewart brought back the medical

1  records prepared a certification of the records which Cynthia McLean signed. (42 AR

2  1242)

3  (119)Plaintiff folded the records under his arm and left without checking and

4  produced the same records at the hearing.

5  (120) On October 19 2004, the Defendants requested the copy of the same medical

6  records from "SAC" Hospital (77 AR 1850) and alleged that 'Admission Note 'was

7  not present in the copy obtained by Defendants from the "SAC" Hospital. (78 AR

8  1855)

9  (121) On November 15, 2004, Plaintiff memorialized the above stated facts in letter to

10  Cynthia MacLean and asked her to include a copy of the 'Admission Note' into the

11  medical records maintained at SAC Hospital because medical records at "SAC"

12  Hospital would not be complete without the 'Admission Note" when the original

13  'Admission Note' was kept in the records at "PVH". That had he been aware on

14  October 11, 2004 that the 'Admission Note 'was not present in the medical records

15  that were certified, he would have asked her to include it into the medical records,

16  since the original 'Admission Note' was present in the medical records at Pomona

17  Valley Hospital and there was no reason why a copy of the same should not also be

18  present in the records maintained at the "SAC" Hospital where the 'Admission Note'

19  originally belonged. The 'SAC" Hospital just did that. (79 AR 1892-1894)

20  (122) In spite of that, the Defendants were not ready to give up so easily. On March 9,

21  2005, the Prosecutor produced false testimony from Desiree Stewart that in August

22  2003, [when she was just a new employee] there was no copy of 'Admission Note' in

23  the medical records.

24  (123)On *cross examination*, Desiree Stewart admitted that in 2003, she did not check

25  the medical records and copies were prepared by the copying service.

26  (124) Desiree Stewart falsely testified that on October 11, 2004 when Plaintiff went to

27  the medical records, Plaintiff talked about the 'Admission Note' with her. [Plaintiff

28

had no need to discuss 'Admission Note' with her or anyone else. He took a copy
which contained the 'Admission Note' and Plaintiff knew that the original
"Admission Note" was present in the medical records at Pomona Valley Hospital]

(125) Desiree Stewart testified that she did not compare the 2003 copy of medical
records which Plaintiff had brought with him to be compared with the original
medical records maintained at the hospital but instead _only_ made fresh single sided
copies of the double sided pages of the medical records in which some of the pages
were two sided and that she prepared affidavit for McLean to sign.

(126) Desiree Stewart also testified that in August 2003, she had made single sided
pages of two sided pages of the medical record. That Plaintiff had brought that copy of
the Chart made in 2003 with him when he came in to Medical Records Department in
2004.

(127) When Desiree Stewart was questioned how many double sided pages she copied
in 2004 she  testified only two (2) pages. The medical record had about seven (7)
double sided pages.  It made no sense to make just copies of double sided pages and
have four pages certified by Cynthia McLean when she had prepared certification for
the entire medical chart. (176 **AR** 4690- 4712)

(128) The ALJ dismissed all of the above charges added in the First Amended
Accusation.

**Medical Board Produces False Testimony from Dr. Disney:**

(129) Dr. Disney was the Chief of Surgery at Pomona Valley Hospital who had
illegally suspended Plaintiff's vascular surgery privileges and had refused to provide
'acts and omissions' all in violation of "PVH" Medical Staff Bylaws and California
Business & Profession Code. When Plaintiff requested injunctive relief, Disney
terminated all privileges, staff membership and denied hearing.

(130) Dr. Disney testified that he was a Canadian who after finishing his residency
in 1999 moved straight to Pomona to start practice.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 35

(131) Dr. Disney falsely testified that proctor was not a <u>supervisor but evaluator</u> (180 AR 5315, line 15-21; 5316; AR 5316-line 17-20) contrary to medical staff bylaws (160 **AR** 2899-2901) (27 AR 754-757) contrary to testimony of another proctor Dr. Atil  who had served as Chief of Surgery at neighboring Glendora Hospital for several years. Dr. Atil testified that proctor is a supervisor, and provisional surgeon cannot proceed without a proctor (174 AR 4340 , 4384-4390;4405,4408,4409 )(30 AR 1113)  and contrary to the testimony of nurse Sadie Ramirez who had worked at the 'PV' hospital since 1962,that proctor was a supervisor (175 AR 4464,4482 ,4483,)  and even Dr. Garg who testified that he was there to see <u>that procedure was done safely and appropriate technique was used.</u>( 179 AR 5202)

(132) Dr. Disney falsely testified that he never talked to Plaintiff on June 8, 2000 or any time later or had any recollection that Plaintiff had difficulty obtaining proctors. Plaintiff's June 9, 2000 letter to Dr. Disney (**19** AR- 699) documented the phone conversation with him a night before. Dr. Disney admitted he received the June 9, 2000 letter from Plaintiff yet never wrote back to Plaintiff, correcting Plaintiff that his conversations with Plaintiff never took place and the Plaintiff was just lying in his June 9, 2000 letter.

(133) Dr. Disney falsely testified that he never told Plaintiff on June 8, 2000 to keep looking for a proctor instead of allowing him to proceed with emergency surgery, as was documented in June 9,2000 letter that Plaintiff never got any help from him (180 AR 5330)

(134) Dr. Disney falsely testified that physician under proctoring can proceed with emergency surgery without a proctor (**180** AR 5331) contrary to unambiguous provisions of medical staff bylaws that unsupervised privileges are only granted after successful removal from proctoring and contradicting his earlier testimony (180 AR 5314- line 15-18)(28 AR1078-1082, 1102-1108)

(135). Dr. Disney falsely testified that he was not aware of operating room staff refusing to let an emergency proceed, making the proctoree find a proctor. He was aware that in this case that the O.R. nurses would not bring the patient to O.R. unless the proctor was physically present in the O.R. Instead, he falsely testified that that policy applied to only elective cases, where Department of Surgery Rules & Regulations provided that Chief of Surgery is required to assign proctors <u>if an assigned proctor is not available to proctor an elective and emergency surgery</u> (28 AR 1102-1106).

(136) Dr. Disney testified that proctor can intervene if proctoree was performing surgery on the wrong leg but was evasive when questioned if proctor would intervene if proctoree was performing bypass in a patient with a fully gangrenous foot .It was alleged in the *Accusation* that Plaintiff did not perform intraoperative angiogram and a femoro-popliteal bypass on surgery done on 6/10/2000 which was proctored by Dr. Garg who did nothing to intervene and correct. Dr Garg testified leg was dead on 6/10/2000 and also on 6/12/2000 when Plaintiff did perform femoro-popliteal bypass graft, yet he did nothing to intervene and allowed injury to be caused to the patient. (180 AR 5317, 5343)

(137) Plaintiff had provided good character references from physicians in the community who had known him for 15-35 years. (23 AR, 24 AR, 25 AR, 26 AR). Plaintiff could have produced hundred more such letters, were it not for evidence to be cumulative.

(138) Dr. Disney slandered that Plaintiff had obtained a reputation of dishonesty. He falsely testified that Plaintiff had been untruthful in his application to Pomona Valley Hospital as to his home address <u>and he was not able to reach him</u> (180 AR 5338). Physicians are not contacted on home addresses and are always contacted on office address or office telephone number.

(139) Plaintiff like any other physician was available by pager, cell phone, answering service, home and office telephone numbers. All the information

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 37

provided was correct. Plaintiff had provided a correct home mailing address- a P.O .Box address because he lived alone and mail had been returned undelivered to senders and word **'mailing home address'** appeared in curriculum vitae attached to application.

(140)  In California personal subpoena service is complete when served on postal box address. Nonetheless, physical home address was listed and available in the White Pages of the telephone book, if Disney wanted the home address so bad, he could get it. He was not contacting about a patient that he could not wait the next business day, as he was trying to inform Plaintiff that he was suspending Plaintiff's vascular surgery privileges and that he could have done so by leaving a message on the voicemail.

(141) Dr. Disney falsely and misleadingly testified by mixing facts between complaints by Plaintiff against emergency proctors in June 2000 for their failure to timely proctor or to stay for the entire procedure and regularly assigned proctors, Dr. Atil and Dr. Beilin (20 AR 730) and falsely charged that Plaintiff would speak whatever he needed to say at that time that seemed exigent to the circumstances, rather than being truthful. (**180** AR 5337, 5338) (**20 AR**)

**Defendants Call Improper Rebuttal Witnesses:**

(142) Defendants improperly produced Dr. Vinod Garg and Patient's daughter as Rebuttal witnesses because their testimony had nothing to do with the rebuttal of any new matter raised in the Plaintiff's case as required by law. Any charges based upon alleged false statements made at the interview should have been brought in the Accusation, since Plaintiff's statements were known to Defendants since the 'Interview,' years before the Second Amended Accusation was filed and Plaintiff said nothing different at the hearing than what he said at the interview.

**Defendants Produce Proctoring Reports at "PVH" in Violation of California Evidence Code Section 1157**

(143) The Defendants introduced proctoring reports which were protected from discovery under Evidence Code 1157 during Dr. Garg's testimony. (85 AR 1980)(86 AR 1983)

**Prosecutor Produces Grossly False Testimony By Dr. Vinod Garg:**

(144) Prosecutor called Dr. Vinod Garg who had served as a proctor on surgeries done on 6/10/00 and 6/12/00 at the Pomona Valley Hospital undeterred by the fact that Dr. Garg had his **license suspended for six months by NY State for fraudulent practice of medicine**. (**179** AR 5196, R.T.4/5/05, *Garg*, p.58, line 11-15)

(145) Dr. Garg was required to complete and file each proctoring report immediately upon completion of each surgery done on 6/10/00 and 6/12/00, yet he waited till 6/18/00, to find out how the patient fared in order to cover himself as a supervisor and shift the blame on the Plaintiff and to fix the two proctoring reports accordingly.

(146) Dr. Garg's testimony and his Proctoring Report for Surgery done on 6/12/2000 were proven to be false based upon his own testimony. Dr. Garg testified, as he had noted in his proctoring report dated 6/18/00, that on 6/12/00, **the right foot was gangrenous, had rigor mortis, dead for a long time like a cadaver, not viable** when Plaintiff did femoro-popliteal bypass on June 12, 2000. (**86** AR 1983) (**179** AR 5222, R.T.4/5/05,*Garg*, p.84, line 9- p. 85, line 15) **whole foot was black. (179** AR 5261, R.T. 4/5/05, *Garg,* p.123, line 14, 15)

(147)There was **no evidence in the medical records of such a gross finding** by any of the nurses or the physicians. Instead, the **nurse had documented a pulse in the right foot on the morning of 6/12/2000, the day of surgery**. Operating Room Nurse Ramirez testified **that pulses were heard by Doppler** in the operated leg at the conclusion of surgery in the O.R, **in the presence of Dr. Garg** before patient was transferred from the operating room table to the gurney as it is a standard practice and was documented in the operative note dictated immediately

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 39

after surgery on 6/12/2000. Nurse's notes in the recovery room showed pedal pulses and a normal[13] capillary filling in the operated leg. Apparently Dr. Garg had no compunction about lying under oath.

**Dr. Garg's Testimony & Proctoring Report for 6/10/00 Surgery was also false:**

(148) Dr. Garg's in his proctoring report for surgery done on 6/10/2000, prepared on 6/18/2000 stated that on June 10, 2000 he told Plaintiff that patient needed an 'immediate femoro-popliteal bypass', and Plaintiff told him that he will do it in 2 days where Plaintiff before each surgery had obtained consent for femoro-popliteal bypass.

(149) Dr. Garg testified that before 6/10/00 surgery <u>he had not seen arteriogram done by radiologist</u>. Without seeing arteriogram, Dr. Garg like any other surgeon anywhere in the World could not determine if patient needed 'femoro-popliteal bypass', yet he had told Plaintiff to do a femoro-popliteal bypass.

(150) On *Cross examination* **Dr. Garg could not recall or refresh his memory** what he told Plaintiff on 6/10/00 even though he had his 6/10/2000 proctoring report right in front of him. He could not support his testimony by his own 6/10/2000 proctoring report (**179** AR 5209, R.T. 4/5/2000, *Garg*, p.71, line 18-23) (**85** AR1980)

(151) Dr. Garg falsely **testified** that patient's <u>**leg was not viable on June 10, 2000,**</u> yet he had [14]noted in the proctoring report that he had recommended

---

[13] . Inspite of all this compelling evidence, the Defendants based upon testimony of Dr. Garg charged in Second Amended Accusation (**131**AR 2229) that Plaintiff had made three false statements that on June 12, 2000 (i) **there was no gangrene** (ii) **no rigor mortis** (iii) **leg was viable.** (**53** AR01441)

These three charges were dismissed by the superior court because patient had after surgery pulses and normal capillary refill in the leg indicating viability.

'immediate femoro-popliteal bypass on June 10, 2000 '(179 AR 5223, R.T. 4/5/2000, *Garg*, p.85, line 16-19.). The nurse had documented pulse in the same foot on the morning of 6/12/2000 and then after surgery. Dr. Garg fully knew that bypass is not needed in a dead leg as he testified that bypass was not indicated on 6/12/2000 because leg was not viable. (179 AR 5223 R.T.4/5/2000, *Grag*, p. 85, line 2-15)

(152) Furthermore, Dr. Garg testified that he never examined the patient before surgery, reviewed medical records and the saw the arteriogram.(**179** AR 5204, R.T. 4/5/2000,*Garg*, p.66, line 19-24; AR 5218, R.T. 4/5/2000, *Garg*, p.80, line 24,25) ,yet he testified that the leg was dead.

(153) **Dr. Garg falsely testified** that he as a proctor **and not a supervisor,** contrary to Medical staff bylaws and Surgery (**71** AR 1774) Department Rules & Regulations, (**28** AR 1096, 1102, 1103, 1104) (R.T.4/5/2000 p.84, line 24-p. 65, line 17) impeaching himself when he testified that he was there to see that surgery is done safely and appropriate technique was used. (R.T.4/5/00, p.64, line 3-6).

(154) In spite of his admitted duty to make sure surgery was done safely and proper technique was used, he did not intervene to take over the case to perform the right procedures, as he believed an amputation or a femoro-popliteal bypass on 6/10/2000 depending on which of his testimony to believe and should have performed an amputation on 6/12/2000, as he had noted in his proctoring report even though the Defendants admitted in its 'Decision', that it was not clear why Dr.Garg did not intervene on June 10, June 12, 2000 ? (**167** AR 3129, last paragraph)

(155) Dr. Garg did not intervene to take over the case to perform the femoro-popliteal bypass on 6/10/00,if that is what he told plaintiff to do on 6/10/200 and

---

[14] .Based on this self-impeached notation in the proctoring report, the superior court without trial by Defendants or by the Court on the Charge of making a false statement found that Plaintiff made the alleged false statement that "proctor [ Garg ] would not allow him to do a femoro-popliteal bypass on 6/10/2000." **A statement Plaintiff made nowhere in the record.**

Plaintiff allegedly told Garg that he will do it in two(2) days, as henoted in his proctoring report.

(156) Dr. Garg also did not intervene to perform amputation on 6/12/2000, if he believed that leg had (i) **gangrene** (ii) **rigor mortis** (iii) **was not viable**.

(157)When patient ended up with amputation on 6/14/00, Dr. Garg fabricated the proctoring reports to protect him as he did in N.Y. when he hid the laparotomy pad left during first surgery, got caught and was suspended by NY State. (**180** AR 5428-543, R.T. 4/6/05, *Mir*, p.123, line 22- p.126, line 2)(**84** AR 01963-1979) after Plaintiff told Dr. Garg on June 14, 2000 that his failure to stay for bypass on June 10,200 led to patient's adverse outcome (**26** AR 5428-30, R.T. 4-06-05, *Mir*, p.123, line 23 thru p.125, line 25)

(158)  Dr. Garg falsely testified that he did not see the patient after surgery or was present at patient's bedside on 6/10/2000, as was documented in the nurses notes (**179** AR, 5238, 5239 p.100, line 18-p.101, line 23)

(159) Dr. Garg falsely testified that nurses did not contact him on 6/11/2000, as was documented by the nurses and could not read his own name in the nurses notes, (**179** AR5244, 5245, R.T.4/5/05, *Garg,* p.106, line 18- p.107 line 21).

(160) Dr. Garg falsely testified that on the morning of 6/12/00.he never told Plaintiff that he would proctor only after he had completed all of his other procedure despite repeated pleas from Plaintiff that his procedure was an emergency and needed to be done urgently to save patient's leg. (**177** AR 4913-14, R.T. 3-10-05, p.113, line 4 –page 114, p. 8)The surgery was finally started at 2115 hour, after completion of all of Dr. Garg's surgeries (**56** AR 01575).  There was no reason for Plaintiff to wait till mid night to do the surgery when he could have done the surgery at 10.00 a.m. and gone on to do other things.

**Prosecutor Produces False Testimony by Patient's Daughter:**

(161) In order to prove that the 'Admission Note'[ showing that patient had varicose vein surgery thus a complete defense to the Charge in the Accusation that

Plaintiff had not used saphenous vein for femoro-popliteal bypass done on 6/12/2000, and that 'Admission Note ' was the history and physical which the Accusation charged was not done], was fabricated and Plaintiff made false statements in relation to such fabrication, Defendants produced false testimony by daughter **that patient did not have a 50 year old one inch surgical scar in her obese groin** (Ht. 5'-4", Wt. 212 1bs.) where the saphenous vein was surgically removed in 1952 even though she admitted that patient had varicose vein stripping in 1950s. Daughter had no access to her mother's groin since the patient had been attending to her needs personally till the day of admission and patient had lived in nursing homes in the prior 8 years (and the daughter did not even remember how many surgeries her mother (GF) recently had had on her leg performed by Plaintiff and denied having any knowledge or of her having signed consent for femoro-popliteal bypass as her personally signed were documented in the medical records ,yet she remembered her mother not having a completely faded and merged 50 year old small white scar in a white skinned person.

(162) Defendants also produced false testimony when daughter testified that patient was transferred for insurance reasons where the patient had both Medicare and Medi-Cal which are universally accepted by all hospitals and physicians and primary care physician had dictated in his History & Physical that day that patient was transferred to "PVH" because surgery could not be done in a timely fashion at "SAC" Hospital.

**Prosecutor Coerces False Declarations from Refreees of Plaintiff Under False Pretense:**

(163) Plaintiff's attorney asked Plaintiff to find physician who have known him for number of years to testify at the hearing supporting his professional competence and character and to obtain letters from such physicians which would provide a substance of their proposed testimony.

(164) Plaintiff produced letters from five physicians who had known him for the past 15-30 years after fully discussing his predicament. Three of the five physicians even assisted Plaintiff with his defense before the Defendants and one even recommended the names of experts to testify at the hearing .All five provided letters of recommendations. Since it was not clear to Plaintiff who to address the letters, he requested the physicians to address the letters just to 'whom it may concern'.

(165). The Defendants came up with another glaring absurd false charge that Plaintiff had obtained letters of recommendations from those physicians for seeking staff membership on some *unknown* hospital staff and not for the purposes of defending at the medical board's hearing. Nonetheless, the Defendants never explained why the physicians would hold two different opinions −one for the medical board and one for the hospitals.

(166)The charge was patently false because Plaintiff was already on staff of just about every hospital in the area. Second, the hospitals only require the names of the referees on the staff application and then directly solicit confidential information from listed referees. The letters of recommendations submitted by a physician have no value for the hospital. Plaintiff knew the practice because he had served on various hospital committees for over 30 years and had provided confidential letters of reference on other physicians directly to hospitals.

(167) The Defendants coerced false declarations from two of the five physicians that Plaintiff had obtained references for the hospital appointment misrepresenting to these two physicians that they will not have to testify at the hearing without ethically disclosing that Plaintiff could subpoena and call them to cross-examine on their declarations.

(168) When Plaintiff's attorney demanded that Defendants produce these two physicians for cross examination, the physicians declined to appear and a big fight broke out between physicians and the prosecutor that the Defendants misled them.

These two physicians never showed up. One of the two physicians later apologized to Plaintiff and told him that the Defendants attorney had threatened and had prepared and coerced the signatures on the said declaration.

**Defendants File Second Amended Accusation Based on False Testimonies of Improperly Called Rebuttal Witnesses Dr. Vinod Garg & Patient's Daughter:**

(169).On April 6, 2005, at the conclusion of the hearing the Defendants filed a Second Amended Accusation "SAA" (**53** AR 01432) (**131** AR 2228, 2229) charging that Plaintiff had made seven (7) false statements during interview / hearing based upon the testimony of Defendant's improperly called rebuttal witnesses, Dr. Garg and the patient's daughter.

**Defendants Falsely Charge Making of False Statements:**

(170)The alleged false statements in the Second AmendedAccusation by Plaintiff were based upon the testimony of two witnesses Dr. Vinod Garg and patient's daughter were as follows:

1. Made false statements that proctor would not allow him to do a femoral-popliteal bypass procedure on June 8, 2000.

2. Made false statements that proctor would not allow him to do femoral-popliteal bypass procedure on June 10, 2000.

3. Made false statement that there was no gangrene on June 12, 2000.

4. Made false statements that there was no rigor mortis on June12, 2000.

5. Made false statement that patient's leg was viable on June12, 2000.

6. Made false statement regarding the reasons for transferring the patient from San Antonio Community Hospital to Pomona Valley Hospital Medical Center, and

7. Made false statements that he did not give the patient's family any other reason for transferring the patient other than the operating room at San Antonio Community Hospital being full when, in fact, the reason he gave the family was that the transfer was due to insurance payment reasons.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 45

(171).The Defendants presented no evidence (i) in support of False Statement Charge # 1 by producing Dr. Lau who was the proctor on the case.

(ii) *Plaintiff nowhere in the administrative record ever made the statement alleged in the False Statement Charge # 2-statements that proctor would not allow him to do a femoral-popliteal bypass procedure on June 10, 2000- which was proctored by Dr. Garg*.

(iii) Patient had pulses and normal capillary filling after bypass surgery on June 12, 2000 therefore **Statements # 3, 4, 5 alleged to be false in Statement of Charges could not be false.**

(iv). Patient was transferred by San Antonio Community Hospital because **emergency surgery could not be done right away which was documented by the Primary Care Physician in his Report of History & Physical Examination** dictated at Pomona Valley Hospital on that day.

The family knew that Patient had both Medicare and Medi-Cal which is universally accepted by all hospitals and physicians Respondent had nothing personally to gain by transferring. The son in law testified that Plaintiff told him that it was imperative he transferred, **that time was the essence,** that **sooner he transferred, sooner he can begin the treatment.**(supra)

<u>Denial of Hearing on Second Amended Accusation;</u>

(172). Plaintiff objected and moved to strike "SAA" (**132** AR 2231 2239) On May 25, 2005, motion was denied by the ALJ. **Plaintiff requested hearing** to introduce additional evidence and had identified expert witnesses including one from UCLA, (**146** AR 2343-2353) that statements made by Dr. Garg were not medically possible or were even ethical. ALJ denied hearing.

<u>Defendants Deny Full & Fair Hearing to Defend:</u>

(173) Defendants abused discretion, fair hearing and denied request to introduce additional evidence, in violation of California APA, California and U.S. Constitution and <u>found against Plaintiff on the remaining six charges of making a</u>

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 46

1  false statement on the Second Amended Accusation without a trial. **The**
2  **allegations in Second Amended Accusation were never actually litigated.** By
3  charging and not affording a full and fair opportunity to Plaintiff to defend ,
4  Defendants employed 'hit and run' tactics.
5  (174) Nonetheless, Defendants could not determine any penalty without proving
6  intent, [15]materiality and making a finding of [16]moral turpitude which it did not and
7  could not since there was no trial. Nonetheless, a [17]bare finding of making false
8  statement could not establish moral turpitude. Plaintiff had no need to make such
9  statements alleged to be falsely made.

10  **Defendants Completely Ignores Admissions By its Experts That Plaintiff**
11  **Made the Correct Diagnosis**:

12  (175)Defendants abused discretion as defined in Code of Civil Procedure Section
13  1094.5 (b) [Abuse of discretion is established if the respondent has not proceeded
14  in the manner required by law, the order or decision is not supported by the
15  findings, or the findings are not supported by the evidence] and in its decision
16  completely ignored the unopposed binding Admissions by Defendant's expert's
17  dispositive of the Charge of misdiagnosis in favor of Plaintiff that Plaintiff made

18
_____

19  [15]. " Agency has burden of proof where
20  administrative charge was that petitioner
    made material misrepresentation to obtain
21  license. **DeRasmo v Smith** (1971) 15 Cal. App. 3d 601,605,606 93 Cal. Rptr. 289

22  [16] . In" *re Helliman* (1954) 43 Cal. 2d 243 247-248; 272 P 2d 768) California Supreme Court
    summarized decisional law defining 'moral turpitude'. This has been variously defined as 'an act
23  of baseness, vileness, depravity' in the private and social duties which a man owes to his fellow
    men or to society in general contrary to the accepted and customary rule of right and duty
24  between man and man. The dishonesty *must be intentional* and *for personal gain,* with evil
    motives and subjective intent. Whether activities involve moral turpitude is dependent upon the
25  motivation of the violator."

26
27  [17] Even a bare criminal conviction does not establish moral turpitude, unless evidence of
    circumstances surrounding the offense is introduced.(Cartwright v Board of Chiropractic
28  Examiners16 Cal. 3d 762; 548 P.2d 1134; 129 Cal. Rptr. 462; 1976 Cal. LEXIS 258).

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 47

the correct diagnosis instead based its decision on irrelevant, impeached testimony by Defendant's experts *on direct examination* completely disregarding the evidence produced on the cross- examination of the Admissions. [18]**By not considering appraising and ruling on 'binding, unopposed Admissions, on the charge of 'misdiagnosis, Defendants <u>denied fair hearing</u>.**

(176) Based on its finding of making one wrong diagnosis, the Defendants abused discretion in making finding of 'repeated and gross negligence' and 'repeated and gross incompetence' in violation of California Business & Profession Code Section 2234 (c) (1) providing "An initial negligent diagnosis followed by an act or omission medically appropriate for that negligent diagnosis of the patient shall constitute a single negligent act." The Defendants' experts had testified that Plaintiff's treatment for his diagnosis of 'thrombo-embolism' was correct and Defendants' treatment of its diagnosis of 'acute thrombosis of "SFA" was not indicated for Plaintiff's diagnosis of 'thrombo-embolism'.

**<u>Defendants Failing to Prove Documentation Charges Alleged in Accusation Inserts New False, Frivolous Absurd Documentation Charges into Their Decision:</u>**

(177) Defendants could not prove the 'documentation charges 'as alleged in the Accusation and could not and did not allege any additional documentation charges even though it had filed two Amended Accusations. The Defendants denied fair

---

[18] '     The officer who makes the determinations must consider and appraise the evidence which justifies them . . . ...The "hearing" is the hearing of evidence and argument. If the one who determines the facts which underlie the order has not considered evidence or arguments, it is manifest that the hearing has not been given. **One decides must hear."**

***Morgan v United States*** (1936) 298 US 468-480.481.*(56 S. Ct. 906, 80 L. Ed. 1288) Cited by California Supreme Court in <u>Cooper v Board of Medical Examiners</u> 1950) 35 Cal. 2d 242; 217 P.2d 630; 1950 Cal. LEXIS 331; 18 A.L.R.2d 593

hearing when they inserted into 'Decision' [19]new absurd findings/ charges on documentation, without an Accusation, prior notice, trial or proof, Nonetheless, these documentation charges were **never actually litigated** and by **denying a full and fair hearing** to defend.

 Nonetheless, Defendants could not [20]lawfully determine any penalty based on 'bootstrapped documentation charges.

**<u>Defendants Include Prosecutor into its Deliberations & Revokes:</u>**

(178) On November 2006 after the conclusion of Oral Arguments by the parties attorneys, the Defendants went into Closed Session and paged **Prosecutor to take part into deliberations,** violating any semblance of a [21]**fair hearing.**

(179) On December 6, 2006, Defendants revoked Plaintiff's medical license with effective date of January 6, 2007.

**<u>Sacramento County Superior Court Writ Proceedings:</u>**

**(07 CS 00036)**

---

[19] . (1) Petitioner June 8, 2000 operative report is unclear[**false**] where its expert Bardin testified that it was clear and he was confused between Gray's Anatomy terminology of Femoral Artery used by Petitioner in the operative report to his use of archaic term as Common Femoral Artery.' (2) failure to document neurologic examination [**false**]. Furthermore ,patient was obtunded and could not respond to questioning as to sensation is the leg. (3) June 10 preoperative history and physical exams are inadequate [**false**]; there is only one history and physical per hospital admission which was done on June 8,2000]. At no hospital in USA , new History and Physical is done every few days or before any repeat surgery. The Medicare pays for only one History and Physical per admission which is done by the primary care or referring physician as was done in this case (4) Petitioner's consent for June 10, surgery contained inadequate information [**false**]. The consent was exactly the same as for surgery done on June 8,2000

[20] . "It follows that the finding must be based upon the Accusation. Here it was not. Disciplinary action cannot be founded on a charge not made."

*Wheeler v State Board of Forestry* (3rd Dist. 1983) 144 Cal. App. 3d 522,192 Cal. Rptr. 693)

[21] .*Quintero v City of Santa Ana* (2003) 114 Cal. App. 4th 810 … deputy city attorney had *other* interactions with the board that gave the appearance of bias and unfairness and suggested the probability of his influence on the board.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 49

(180) *In* Opposition to the brief on writ of administrative mandamus at superior court,( Sacramento County Superior Court Case # **07 CS00036**) the Defendants **misled the court on charge of misdiagnosis in claiming a 'strong presumption of correctness'** citing irrelevant evidence produced on direct examination completely <u>ignoring</u> **the evidence produced on cross-examination of their experts and lead argument made by Plaintiff's attorney in his brief of 'binding admissions' by its experts**, dispositive of the charge of 'misdiagnosis' in favor of Plaintiff, since it had none.

(181) **Duped by the Defendants under 'strong presumption of correctness',** the superior court in its ruling, like the Defendants **also excluded evidence or did not consider, appraise ,weigh and rule on the unopposed, arguments and the evidence of 'binding 'admissions' by Defendants' experts, dispositive of charge of 'misdiagnosis', in favor of Plaintiff that Plaintiff made the correct diagnosis.** Instead, superior court relied on the testimony of Defendants' expert Dr. Bardin on *direct examination* without any reference to his admissions *on cross-examination* and made no mention of testimony of Plaintiff's experts that Plaintiff made the correct diagnosis and <u>made a finding based on 'weight of the evidence' without weighing the bulk of pivotal evidence or the 'admissions' by Defendants' experts that Plaintiff made the correct diagnosis</u> and on the contrary found that Plaintiff made one wrong diagnosis- **as pled by Defendants**.

(182) *Defendants in opposition to writ petition pled two grounds for 'repeated acts of negligence and repeated acts of incompetence', (1) Improper transfer of patient from San Antonio Community Hospital to Pomona Valley Hospital (2) Making a wrong Diagnosis. The superior court dismissed finding of improper transfer of patient. The superior court could not lawfully and did not uphold Defendants' findings of **'gross' and 'repeated negligence'** or **"gross" and 'repeated incompetence'** based on making of one wrong diagnosis and instead found that Plaintiff's contentions were not entirely lacking in evidentiary support.*

(183).The superior court dismissed five (5) out of six (6) facially false charges of making false statements.

(184)The superior court did not <u>remand</u> for a trial on the remaining charge of making false statement-a trial Plaintiff never had had, found that Plaintiff made one untruthful statement that

> "Proctor [Dr. Garg] would not *allow* him to do a
> femoro-popliteal bypass on June 10,2000"

The Superior Court was again misled by the Defendants because **Plaintiff nowhere made the above statement anywhere in the administrative record** as stated above.

(185) The superior court was so well **duped by the defendants** under strong presumption of correctness that it based the finding of Plaintiff making one false statement on nothing but a statement in Dr. Garg's <u>self-impeached proctoring report</u> for June 10, 2000 surgery improperly and belatedly prepared on 6/18/00 <u>that he told Plaintiff to do a femoro-bypass</u> and Plaintiff told him that he will do it in two (2) days.

(186) As stated above Dr. Garg was asked on *cross examination*, what he told Plaintiff on June 10, 2000, and Garg could not recall even though he had his proctoring report in front of him to refresh his recollection. There was a reason for not be able to recall, because he had testified *on direct examination* <u>that the leg was dead on 6/10/00</u>, thus impeaching his own proctoring report that 'he told Plaintiff to do a bypass and Plaintiff told him he will do it in two days' and defendants misled the superior court and used proctoring report impeached by Dr. Garg himself to find against Plaintiff that he made the false statement.

(187) Said another way, if Dr. Garg's sworn testimony <u>that the leg was dead on 6/10/00 is correct</u>, then Garg could not have allowed to do a bypass on June10, 2000 and the 'statement' alleged to be false could not have been false.

(188)The superior court could not and did not make any finding of '***moral turpitude***' because there never was a trial, no proof was ever offered if any false

statement was ever made ,let alone providing evidence of moral turpitude. Without a finding of *'moral turpitude'* the Defendants could not lawfully impose any penalty based on *bare finding* of allegedly making a false statement at the hearing without  proof of intent, materiality or of any benefit to Plaintiff ,as stated above. (189)The statement alleged to have been falsely made was not material because Plaintiff restored pulses in the foot after each surgery and brought patient back to same status patient had before the incident which occurred before admission to the hospital and patient did not need femoro-popliteal bypass.

(190) Furthermore, Defendants' expert admitted that **patient would not need femoro-popliteal bypass or intraoperative angiogram for Plaintiff's diagnosis of 'thrombo-embolism'** and **Plaintiff never admitted that he made the wrong diagnosis that <u>he needed the excuse</u>** that he could not perform femoro-popliteal bypass because proctor Garg would not just allow it.

(191).The superior court was so grossly misled by Defendants that did not remand for hearing on new charges/ findings on documentation bootstrapped into the Decision by Defendants, without an accusation, notice, trial or proof, even though the superior court dismissed some of them despite these charges were **never actually litigated** and Plaintiff **never had full and fair hearing to defend**.

**<u>Superior Court Sets Aside Defendants' Decision & Orders to Redetermine Penalty Consistent With the Findings of Superior Court on Writ Petition;</u>**

(192). On August 10,2007, the superior court <u>set aside and vacated the entire Defendants' 2006 Decision</u> pursuant to Code of Civil Procedure Section 1094.5 (f) and remanded to *<u>re-determine penalty consistent with the findings of the court on submitted matters on the writ of administrative mandamus</u>*.

**<u>Writ Petition to California Court of Appeal:</u>** (**C 058393**)

(193) Plaintiff's attorney late attorney Douglas Schwab filed writ of mandate pursuant to California Business & Profession Code Section 2337 and requested Immediate **Stay of Remand Order** to redetermine penalty consistent with the

findings of the superior court based on several due process violations and lack of substantial evidence supporting Defendants' findings and of the Superior Court. (194) On April 4, 2008, the California Court of Appeals (3rd.Dist.) promptly summarily denied the writ of mandate without ordering defendants to file opposition [where writ petition alleged denial of due process and lack of substantial evidence supporting the Defendants' decision as well as by the superior court], without ordering opposition, issuing peremptory writ, providing oral arguments or issuing a written opinion.

(195) The Court of Appeal decided writ under **Business & Profession Code Section 2337**, which provides that review of Defendants' Decision would **only be by extraordinary writ.** The Section 2337 is unconstitutional because **it is unreasonable, constitutionally vague and overbroad**. The ground upon which the Attorney General advanced the passage of the bill and law was to provide speedy resolution of physician discipline in order to protect public was unreasonable and unmeritorious because, a physician who is revoked or disciplined cannot practice unless a stay order is issued by the superior court upon its finding that the revoked physician has reasonable probability of prevailing in the writ proceeding. There is no benefit to it and alternative would be to provide fast tracking or expedited appeals instead of discretionary writs.

(196). The Statute is unconstitutional because does not provide the same procedural protections available on 'appeal', to other litigants; denies due process and equal; protection of laws and protection of property rights according to the 14th Amendment to U.S. Constitution.

(197). There is **no accountability or transparency of the process**, and without ordering opposition, dismisses physician's contentions on writ as unmeritorious and disposes off in one line summary denial as if on merit and blocks appeal to California Supreme Court because California Supreme Court considers appeals from written opinions of the court of appeal and not from summary denials.

(198). In Plaintiff's case there were gross lack of fair hearing by Defendants, yet court of appeal did nothing even to question Defendants and summarily dismissed the writ.

(199) The Rules adopted by Court of Appeal are also **irregular** and **unconstitutional**. In **ordinary writs**, the opposing party can file an opposition without an order from the court and any such denial of writ is not considered on merit. On the other hand in extraordinary writ an opposition is only filed upon order from the court of appeal and court of appeal can summarily deny without such an input, and yet without a written opinion considers denial of the writ on merit where the denial of the writ in Plaintiff's case could not possibly have been on merit.

**Defendants on Remand Recycles its Set Aside & Vacated 2006 Decision as 2008 Decision and Redetermines Same Penalty in Disobedience of the Court Order, Writ & Judgment to Determine Penalty Consistent With the Findings of the Court:**

(200) As a **delaying and harassing tactic** and to further injure Plaintiff the Defendants took almost **one year** to reach its 2008 'Decision' on remand.

(201) Defendants abused discretion and denied fair hearing when it appointed some of the members of the hearing panel who had revoked in 2006 and had included prosecutor into its deliberations as member of the hearing panel in 2008 reviewing their own set aside and vacated Decision by the superior court and then declining to obey the order, writ of the court.

(202). On June 13,2008 , defendants **in contempt disobeyed superior court's order**, writ and judgment on the writ of administrative mandamus to re-determine penalty consistent with August 10, 2007 findings of the superior court on writ petition.

(203) The Defendants on remand recycled ***word by word, paragraph by paragraph, page by page,*** its set aside and vacated **2006 Decision**, as its **2008 Decision** without providing oral or written arguments on redetermination of penalty and without

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 54

considering evidence of mitigation, that Plaintiff had practiced seven years after the alleged incident in California without any incident, complaint, disciplinary action or any medical malpractice judgments or settlement against plaintiff.

(204). That Plaintiff 3 years after the incident had passed his specialty Recertification examination by American Board of Thoracic Surgery in 2003 and had earned two hundred (200) hours of AMA Category I Continuing Medical Education (CME) credits.

(205) The Defendants **falsely** inserted findings of '***gross***' and '***repeated negligence***' and '**repeated and gross incompetence**' which had not been upheld by the Superior Court in its findings on writ petition.

(206). Defendants **falsely and in bad faith** made the finding of 'repeated' and 'gross' negligence' based on its finding of making one wrong diagnosis, in violation of California Business & Profession Code Section 2234 (c) and (1)[ An initial negligent diagnosis followed by an act or omission medically appropriate for that negligent diagnosis of the patient shall constitute a single negligent act.] where Defendants expert Dr. Bardin had testified that Plaintiff had provided the correct treatment for his diagnosis of 'thrombo-embolism' as admitted and that alleged treatment of Defendants' diagnosis of' acute thrombosis of "SFA"' by femoro-popliteal bypass and intraoperative angiogram was not indicated for Plaintiff's diagnosis thus constituting under law a **single act of negligence**.

(207) Defendants falsely needed to make the finding of 'gross' and 'repeated' negligence' in order to revoke because Defendants admitted in its 2006,2008, 2010 'Decisions' that no penalty could be determined based on finding of 'single act of negligence', that everyone is allowed to make a mistake. Defendants misled the superior court.

## Post-Remand Proceedings at Superior Court:

(208) Plaintiff made a Motion to Set Aside and Vacate Penalty because Defendants **disobeyed writ** for not re-determining penalty consistent with findings of the superior

court, instead made a new decision which was nothing but *word by word, paragraph by paragraph, page by page* the same old set aside and vacated 2006 decision and did not provide a hearing on penalty redetermination.

(209) That Defendants **unlawfully** made a finding of **'repeated 'and 'gross' negligence which had not been upheld by superior court based on allegedly making one wrong diagnosis** and improperly determined penalty.

(210) That Defendants could not impose any penalty on allegedly making one false statement at the hearing **which Plaintiff made nowhere in the record** and **without trial** and **without finding of 'moral turpitude'** or intentional dishonesty by the superior court or by the defendants.

(211) Plaintiff presented to the [22]superior court the evidence after reviewing 748 consecutive Disciplinary Decisions by the Defendants in the 2 ½ year period from January 12,2006 to July 2008 when Plaintiff was revoked twice and produced evidence that Defendants discriminates members of the minority group as judged by their **complete names** without even including Afro-Americans who have Anglo-European names.

(212) Plaintiff presented to the superior court that the members of minority group are most likely to get 'revoked' and least likely to get lightest penalty of 'reprimand and these members of minority group are least likely to settle with the Defendants, showing a perception amongst members of minority groups that they are unfairly targeted.

---

[22] **. The district court granted motion to dismiss on allegations of discrimination as determined on surnames of physician even though Plaintiff never provided the list of complete names of 748 physicians either to the superior court or to the district court. Plaintiff only included names which were unmistakably African, East Indian, Middle Eastern, Asian and Hispanic. The margin for error was less than one percent. Nonetheless, this information is only presented here for completeness of the procedural history before the superior court. Based on district court's ruling on motion to dismiss SAC, Plaintiff is no longer alleging discrimination under the First Claim.**

(213). The revocation rate for Physicians with minority names was 34% as compared to overall revocation rate of 11.7%. The rate for reprimand the lightest penalty for minority names was 25% as compared to overall rate of 33.1%, the probation rate for minority names was 28% as compared to overall probation rate of 35.1%.

(214)That Plaintiff was the only Physician who was revoked twice for allegedly making a 'wrong diagnosis', where in the same months when Plaintiff was revoked, Defendants had reprimanded [23]physicians who had admitted committing far more

[23] . **The following information was part of the record before superior court and is stated here for completeness of prior procedural history. The following physicians were reprimanded in February of 2007, when Plaintiff was revoked. This showed at a minimum an arbitrary and disproportionate penalty of revocation to the offense of making one wrong diagnosis. The extreme penalty of revocation given to Plaintiff as compared to penalty of reprimand awarded to these physicians with far more serious offenses first in the month of February 2007 and then in July 2008.**

(i)     **Ebenezer Olatunde Ajilore, MD**

Dr. Ajilore was charged with gross negligence for performing unnecessary total abdominal hysterectomy for questionable, chronic uterine bleeding which was not an indication for surgery where such bleeding could have been controlled by oral contraceptives; Operative report did not adequately and accurately describe the operative findings. Following discharge, patient was found to have obstruction of left ureter. There was extreme departure from standard of care which required moving the bladder away from uterus during surgery and general unprofessional conduct.

(ii)    **Jeffery P. Block, MD**

Dr. Block was charged with gross and repeated negligence, incompetence, failure to maintain adequate medical records. He performed colposcopy on a pregnant woman to biopsy a high grade pre-cancerous lesion. The procedure caused lacerations within vagina and left ovary. The surgery was avoidable .The pathology report showed a portion of fallopian tube in the specimen. The operative notes were inadequate to describe the event that took place.

(iii) **Marshall William Grant, MD**

Dr. Grant was charged with repeated and gross negligence in care of 12 patients. Medical Board's penalty was issuance of letter of reprimand.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION  -  57

(iv)  **Freddie L. Hayes, MD**

Dr. Haynes was charged with 29 different causes for discipline for negligence, repeated negligence, inadequate medical records, in 14 different patients.

(v)  **Syed Faisal Jafri, MD**

Dr. Faisal was found to have unethically used a letterhead of University of Kansas ,violating California B & P Code Sections 141(a), 2305, and 2234

(vi) **Veronica Lazarus, MD**

Dr. Lazarus was cited when he failed to report change of address and practiced under false and fictitious name without a fictitious name permit. Dr. Lazarus was charged with gross negligence, repeated negligence, incompetence, false statement on the pathology request form, which she admitted, violation of professional confidence, inadequate records.

(vii) **Medhat Mansour, MD**

Dr. Mansour was found to have failed to maintain adequate  medical records in two patients and repeated acts of negligence, repeated negligence.

(viii) **Eric Neil Sorenson, MD**

Dr. Sorenson made the wrong diagnosis of herpes of labia when the patient had cancer inspite of several repeat visits with complaints of bleeding from the vaginal area. He continued to treat with medications without further examination. The cancer subsequently metastasized and  patient died. He also failed to maintain adequate records.

**Following physicians were reprimanded in July 2008,**
**when petitioner was revoked for the second time in June 2008.**

(i)     **Charles Amis Finn, MD (License # G-71848)** Dr Finn failed to perform an adequate physical examination, failed to maintain medical records, and missed the diagnosis of acute, complex fracture of the proximal tibia in violation of Business & Profession Code section 141(a), 2305  and 2234.

(ii)    **Hashemiyoon, Robert Babak, MD (License # G-86202)**  Dr Hashemiyoon admitted to prescribing dangerous drugs to patients ,he treated  over the internet ,without ever examining the patients in person ,in violation of California Business & Profession Code section 2227,subdivision (a) (4).

(iii)   **Huberman, Richard Allen, MD ( License # G-28477)** Dr. Huberman performed extensive surgery, planter fascia release and surgical excision of

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION  -  58

heel spur on the wrong foot in violation of California Business & Profession Code sections 141(a), 2305 and 2234

(iv)     **Kotzen , Rene Marlon , MD (License # A-53047)** Dr. Kotzen had a delayed recognition of post-operative complication and failed t o recognize its severity with patient developing cauda equina syndrome.,a paralysis, requiring an immediate decompression, in violation of California Business & Profession Code sections 141(a), 2305 and 2234

(v)     **Manzini, Joseph Anthony, MD (License # G-62860)**

Dr. Manzini had pled guilty to crime, violating 21 U.S.C. Sections 331(a) and 333( a)(1) for the delivery for introduction into interstate commerce of a misbranded drug, unprofessional conduct under California Business & Profession Code sections, 2226 and 2237. For two years, he purchased and Administered.to approximately ten patients unapproved by FDA, Botulinum Toxin Type A without informing patients ,in violation of California Business & Profession Code Sections 2238 Dr. Manzini was sentenced to two year probation.

(vi)     **McKeen , Robert V. Jr., MD (License # C-51274)**

Dr. McKeen performed major, lap band surgery on two patients who developed complications. But Dr. McKeen was not available. In one case, he was out of the state ,in violation of California Business & Profession Code Sections 141(a), 2305 and 2234.

(vii)     **Odea, John Patrick Kle, MD (License # A-A-32629)**

Dr. Odea admitted to factual allegations in the Accusation of Repeated negligence on several patients; incompetence; failure to maintain records; unprofessional conduct.

(viii)     **Osei-Tutu, Earnest Paul, MD (License # G-85302)**
Dr. Osei-Tutu treated 13 patients with a revoked license in violation of California Business & Profession Code sections 141(a), 2305 and 2234

(ix)     **Patel, Jaotinkumar K, M.D. (License # A-43752)**

Dr. Patel admitted each and every charge and allegation in the First Amended Accusation No. 04-2005-168707. That he repeatedly missed the diagnosis of cancer of the breast over 10 month period of care when patient repeatedly presented with a breast lump. Patient finally had surgery, chemotherapy and radiation but passed away.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 59

serious offenses, had made several wrong diagnosis, performed unnecessary surgeries and had caused injury to patients by their technical incompetence or misdiagnosis. (215) Plaintiff requested superior court to remand or a hearing on the issue of discrimination by the Defendants based on California case law. (***Talmo v Civil Service Comm.*** (Cal. App.2 Dist. 1991) 231 Cal App. 3d 224 282 Cal. Rptr. 240) and the statistical evidence of review of 748 consecutive cases of discipline as described above.

(216).The superior court denied remand to determine if Plaintiff received disparate treatment because of his national origin and religion and denied the Motion to Set Aside and Vacate penalty. The issue presented in this Complaint of Defendants discriminating was not actually litigated before.

(217) Plaintiff also requested superior court for remand for a hearing on the issue of discrimination by the Defendants based on California case law. (***Talmo v Civil Service Comm.*** (Cal. App.2 Dist. 1991) 231 Cal App. 3d 224 282 Cal. Rptr. 240) and the

(x)      **Sirois ,Cindy Nguyen, MD (License # A-71013)**

Dr. Sirois failed to disclose in her license application in Alaska, that she was subject to investigation by the Florida Medical Board in 2005 ,which resulted in citation and fine, in violation of California Business & Profession Code sections 141(a), 2305.

(xi)     **Stadler, Edward Alan, MD (License # G-23122)**

Dr. Stadler admitted truth of each and every charge and allegation in the Accusation No. 04-2005-171289. of repeated negligence, of not making the diagnosis of breast mass which was cancer .Instead ,he started on harmone therapy which was contraindicated. Patient about three years later had breast surgery and was started on chemotherapy.

(xii)    **Trachtenberg, Neil, MD (license # A-32136)**

Dr. Trachtenberg performed surgery without a consent in violation of California Business & Profession Code Sections 141(a), 2305 and 2234.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION –

statistical evidence of review of 748 consecutive cases of discipline from January 2006 to July 2008, when Plaintiff was revoked twice.

(218).The superior court denied remand to determine if Plaintiff received disparate treatment because of his national origin and religion and denied the Motion to Set Aside and Vacate penalty on other grounds as well.

(219) On January 10, 2009, superior court discharged writ of administrative mandamus without providing any relief.

**Writ of Mandate to California Court of Appeal:(C 061570)**

(220) Plaintiff in writ to Court of Appeal stated that Defendants (i) disobeyed writ of superior court pursuant to California Code of Civil Procedure § 1097 when it did not determine penalty consistent with findings of superior court on writ petition and recycled its 2006 decision as 2008 decision.

(ii) did not provide oral and or written arguments as was required to provide under law and according to recent opinion by Court of Appeal( *Ventimiglia v Bd. of Behavioral Sciences*) (2nd. Dist. Nov. 2008) 168 Cal. App.4th 296).

(iii) That **no penalty could be lawfully determined based on the findings made by superior court on writ petition**.

(iv)That Defendants abused discretion and denied due process in **finding unsupported by evidence that Plaintiff made a wrong diagnosis.**

(v). That Defendants abused discretion and **made findings without hearing or evidence** that Plaintiff made a false statement during administrative hearing.

(vi). That Defendants abused discretion and **inserted new false frivolous documentation charges into its Decision and determining penalty without an Accusation, notice, hearing or proof.**

(vii). The Defendants abused discretion in not considering evidence of mitigation.

(221) On February 22, 2010, the California Court of Appeals (3rd Dist.) in an Unpublished Opinion (**Case # C 061570**) agreed with the Plaintiff and issued peremptory writ ordering superior court to set aside and vacate its order discharging writ of administrative mandamus and to set aside and vacate Defendants' Corrected Decision of June 13, 2008 to revoke and to remand <u>for board to re-determine penalty consistent with the August 10, 2007 Ruling of the superior court, as was originally ordered by the superior court on August 10, 2007, pursuant to</u> **California Code of Civil Procedure  § 1097** and to **provide oral or written arguments.** The court found that the **dismissed findings by the superior court of improper transfer changed the factual and legal basis of the decision of revocation**. The court ordered that **remand was limited to determination of penalty only.** [Not to make new findings]

(222)The court of appeal declined to rule on the merits of Ruling of the Superior Court August 10, 2007, on the issue of misdiagnosis; finding of making one false statement and bootstrapped documentation charges- based on *res-judicata* on its prior summary denial of discretionary extraordinary writ in 2008 for stay of remand– an issue which was not raised or briefed by the parties, as required under California Government Code Section 68081.

**Denial of Petition for Review By California Supreme Court** (S 181557)

(223)The Supreme Court denied Petition for Review.

**Superior Court Sets Aside & Vacates its Prior Judgment Discharging Writ & 2008 Decision & Remands:**

(224 ) The Sacramento County Superior Court pursuant to the order of Court of Appeal set aside and vacated its decision discharging writ and the  Defendants' 2008 Decision to revoke, remanded and ordered to re-determine penalty as ordered by Court of Appeals 3rd  and to provide oral or written arguments. The superior court presided by Hon. Judge Michael Kenny provided that if Plaintiff was

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION  -  62

dissatisfied with the decision of the "MBC" on remand, **Plaintiff post remand could file a supplemental writ petition or a "new writ petition".**

**Defendants on Remand in Contempt of the Court Once Again Recycles its Set Aside & Vacated 2006 & 2008 Decisions as 2010 Decision and Redetermines Penalty Consistent with its 2010 Decision instead of Findings of Superior Court on Writ Petition Sacramento County State Superior Court Case No. 07 CS 00036 as Ordered:**

(225) On July 29, 2010, oral arguments were held before Defendants at Sacramento, California. Plaintiff objected to inclusion on the panel of two members of the medical board Mary Moran and Gerri Schipske who had participated in 2006 and 2008 Decisions respectively and their 'Decisions' had been set aside and vacated. Defendants declined to remove these two panel members.

(226) On October 27, 2010, the Defendants in contempt of the 2007 order, writ and judgment of the superior court and in contempt of the 2010 Decision of the California Court of Appeals 3rd for the second time made effective its 2010 Decision which was nothing but *word by word, paragraph by paragraph, page by page* **copy of twice previously set aside and vacated 2006, 2008 Decisions.**

(227) The Defendants retained fully its legal and factual basis of its 2006 and 2008 Decisions which the California Court of Appeal 3rd had found had changed in view of dismissed findings by the superior court of improper transfer of patient from San Antonio Community Hospital to Pomona Valley Hospital causing unreasonable delay in surgery. **Dismissal of finding of improper transfer changed the factual and legal conclusion of 'repeated negligence 'into single act of negligence** yet Defendants retained their factual and legal conclusions of repeated and gross negligence.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 63

(228) The Defendants in contempt intentionally, willfully and knowingly disobeyed the order, writ and interlocutory judgment of superior court to re-determine penalty consistent with superior court's findings on writ petition and recycled its illegal set aside and vacated 2006, 2008 as 2010 decision, <u>because Defendants knew it could not lawfully redetermine any penalty based on 2007 findings of the superior court on the writ petition</u>.

(229) In order to achieve that end, Defendants abused discretion as defined in Code of Civil Procedure Section 1094.5 (b) once again falsely made findings of **'*repeated' and ' gross' negligence*' and 'repeated' on 'gross' incompetence' which had not been upheld by the superior court,** based on allegedly making **one wrong diagnosis** in violation of California Business & Profession Code Section 2234 (c) (1) providing "An initial negligent diagnosis followed by an act or omission medically appropriate for that negligent diagnosis of the patient shall constitute a single negligent act." The Defendants' experts had testified that Plaintiff's treatment for his diagnosis of 'thrombo-embolism' was correct and Defendants' treatment of its diagnosis of 'acute thrombosis of "SFA" was not indicated for Plaintiff's diagnosis of 'thrombo-embolism' as stated above.

(230)The Defendants repeatedly admitted in its 2006, 2008 and 2010 decisions that there is no penalty  for single act of negligence.

(231) The Defendants abused discretion as defined in Code of Civil Procedure Section 1094.5 (b) and based on making one alleged 'wrong diagnosis' placed Plaintiff on probation and imposed the harshest penalty **prohibiting solo practice of medicine** which was not an issue in the Accusation or in its two Amendments and on the contrary the alleged incident had occurred 10 years previously when Plaintiff was working under the direct supervision of other physicians. **Plaintiff had practiced Solo for seven (7) years following the alleged sole medical incident** without any complaints.

(232) <u>Defendants prohibited Solo Practice to injure Plaintiff because there are no</u> <u>jobs available for physicians who require supervision by another physician because</u> <u>such jobs are economically useless to any employer because it duplicates the</u> <u>expense of patient care without any real benefits to the employer.</u>

(233) The Defendants abused discretion as defined in Code of Civil Procedure Section 1094.5 (b) and imposed heavy expensive penalty for unproven charge of making one false statement and bootstrapped documentation charges which would cost Plaintiff more than $ 40,000 a year for monitoring and cost of probation ,making it economically impossible to practice as an employee. Furthermore there no jobs for physicians with restricted licenses requiring cost, time and services of another physician to supervise Plaintiff for documentation which would be of no value to any employer. **Defendants once again continued to discriminate Plaintiff from equal opportunity to practice medicine and earn a livelihood**.

(234). The Defendants abused discretion as defined in Code of Civil Procedure Section 1094.5(b) and **ordered monitoring of billings-which was not an issue** in accusation and no employer is going to have his or her bills monitored, checked and scrutinized and have his /her privacy interfered with just for sake of an employee because it is the employer who does the billing for the employee.

(235). As harassment, the Defendants ordered an expensive ($ 20,000) ethics course and monitoring for its unproven and false charges of making a false statement which were not actually litigated, without full and a fair hearing and instead made glowing tributes and praises to Dr. Garg in its 2010 Decision for his glaring false testimony.

(236). Defendants never took any action against Dr. Deck because Dr. Deck was one of them for falsifying his curriculum vitae that he was certified by Vascular Surgery Boards and General Surgery Boards when in fact he was not certified by any Board in order to qualify as an expert for the Defendants.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 65

(237). On the morning before Dr. Deck testified some official from Medical Board came to thank him for his false testimony Dr. Deck was about to give.

(238).The Defendants ordered expensive course on documentation to be repeated several times during five (5) years of probation based on bootstrapped documentation charge, without accusation , actually litigating or providing a full and a fair hearing to Plaintiff. Defendants rejected the recently completed such a course at UCSD by Plaintiff who had taken the course to meet the general CME licensing requirement for the Pennsylvania Medical Board.

(239).The Defendants in order to annoy and harass ordered psychiatric examination because Plaintiff had opposed Defendants' decisions in the state courts.

(240). The Defendants abused discretion as defined in Code of Civil Procedure Section 1094.5 (b) in not considering evidence of mitigation. Plaintiff had practiced solo for 7 years in California after the alleged incident in 2000 without any complaints and without ever any settlements or judgments in a medical malpractice case true till this day.

(241) After the 2000 alleged incident involving making a wrong diagnosis, Plaintiff was Recertified in 2003 in his specialty by American Board of Thoracic & Cardiovascular Surgery. Defendants in order to annoy and harass **ordered Plaintiff to pass an examination by University of California, San Diego (UCSD)** before he could resume practice and **in addition ordered Plaintiff to take expensive clinical courses** based on allegedly making a wrong diagnosis where Plaintiff presented evidence of **340 Hours** of Category I AMA Approved Courses at UCLA and at New York Columbia Presbyterian Medical Center.

(241)The requirement of passing an examination was a **trick**. Defendants have a very close working relationship with UCSD as Defendants provide millions of dollars of income annually to UCSD by ordering clinical courses to disciplined

physicians. Defendants wanted UCSD to come up recommendations that Plaintiff was incompetent so that they could have evidence which they did not have it before. Plaintiff is personally aware of a case of a physician of Indian origin, a Sikh from Torrance, California. The medical board could not come up with anything against him, instead ordered to take clinical course at UCSD. This Sikh physician was naïve and uninformed of the tactics and [24]discriminatory conduct of Defendants and had no resources to pay an attorney, decided to take the course which he felt was benign considering what could possibly go wrong. At the end of the course, the UCSD gave an outrageously prejudicial and derogatory evaluation of the Sikh physician recommending that he should go back to medical school or internship and residency training providing medical board the ammunition to discipline him which medical board did not have it before.

(242) Defendant's order requiring Plaintiff to pass an examination flies on the face of the evidence that Plaintiff holds by examination a current, active, unrestricted medical license by Commonwealth of Pennsylvania which Plaintiff has held continuously in good standing since 1974. In 2008, the medical board of Commonwealth of Pennsylvania after review of the administrative record of the proceedings before the "MBC" and initial showing by Plaintiff had rejected the "MBC" 2006 Decision and 2007 Decision by superior court remanding, dismissed referral proceedings against Plaintiff and has renewed license in 2008, 2010 and 2012.

Furthermore, the Order to pass an examination based on sole, isolated, remote 2000 incident was unreasonable since in 2003 Plaintiff took and passed Recertification examination by his specialty Board, the American Board of

---

[24] . On July 19, 2011, the Medical Board of California paid $ 750,000 in settlement money to two of its employees for racial and gender discrimination by former Executive Director Ron Joseph, and former Executive Director David Thornton. (Superior Court of California, Sacramento, Case No.: 05AS03244).On 7/10/2003, Ron Joseph prepared, signed and filed Accusation against Plaintiff. On 11/8/2004, David Thornton prepared, signed and filed First Amended Accusation. On 4/6/2005, David Thornton prepared, signed and filed Second Amended Accusation against Plaintiff.

Thoracic Surgery ("ABTS") and was recertified for ten (10) years. The "ABTS" awarded 200 hours of Continuing Medical Education Credits to Plaintiff for passing the recertification examination.

( 243) In order to annoy and harass, Defendants ordered that Plaintiff be placed on probation in other state such as Pennsylvania which had rejected the 2006 Decision of the Defendants and had renewed active ,current ,unrestricted Pennsylvania Medical License. The order was unenforceable because Defendants have no jurisdiction in Pennsylvania and Pennsylvania Medical Board makes its own determinations on penalty in referral proceedings and does not take orders from another state. It appears defendants were trying to discipline medical board of Pennsylvania and teach them a lesson for renewing Plaintiff's medical license.

(244) In order to annoy and harass, Defendants placed restrictions on his travels and his freedom of movements and ordered to notify defendants 30 days before Plaintiff intended to leave California for more than 30 days.

(245) Defendants'2010 Decision is without jurisdiction and is in contempt of the 2007 superior court's writ, order and interloculatory judgment remanding to re-determine penalty consistent with the findings of the superior court and 2010 order of California Court of Appeal 3rd setting aside and vacating 2008 revocation by the Defendants and remanding and affirming the 2007 order, writ, interloculatory judgment of the superior court and making a specific finding that improper transfer of patient changed the legal and factual basis of the defendants' 2008 decision revoking from repeated negligence or incompetence to single act of negligence of making a wrong diagnosis, which according to Defendants' assertion in each of their Decisions that there was no penalty for single act of negligence. The California Court of Appeal 3rd cautioned not to make new findings limiting remand to penalty determination i.e. not to re-allege repeated negligence. This is exactly what the Defendants did in order to place Plaintiff on probation.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 68

(246) In a different writ petition, a different Sacramento County Superior Court (Case No.:**34-2010-80000713**), declined to enforce 2007 order, writ and judgment of the prior superior court and 2010 Decision of California Court of Appeal 3rd and the judgment and to order redetermination of penalty consistent with the 2007 findings of the superior court on writ petition. The California courts just gave up and the judicial branch of the government did not to court a confrontation with the executive branch of the same government in holding members of the medical board in contempt.

(247) The Court (presided by Hon. Timothy M. Frawley) excused itself and found that writ petition (Sacramento County Superior Court Case No.: 34-2010-80000713) based on 2010 Decision **was not continuation of 2007 writ petition or the _matter_ **(Sacramento County Superior Court Case No.07 CS 00036).**That Plaintiff did not challenge the 2010 Defendant's Decision in the original proceeding and Plaintiff chose to file a new petition.** (Superior Court's Ruling on Motion for New Trial, dated November 2, 2011), in contradistinction to pre-remand order of another court. (Presided by Hon. Michael Kenny,)(*Supra*, ¶ 224)

(248). The Court granted the writ in part in vacating the requirement of psychiatric examination. Defendants claimed that the order for psychiatric examination was appropriate because Plaintiff had filed writ petitions against medical board. The court provided that under such logic every attorney should undergo psychiatric examination.

(249)Before the superior court dismissed the requirement of psychiatric examination, Plaintiff was constantly harassed by medical board of California to make an appointment with the psychiatrist appointed by "MBC", employing the same old trick as they used against the Sikh physician. (*Supra* ¶ 241)

(250)Defendants violated Plaintiff's right under the First Amendment for right to petition court.

(251).The superior court was without jurisdiction under California Code of Civil Procedure Section 170.6. The case was originally assigned for writ petition and for all purposes to Hon. Judge Lloyd Connelly (**Sac. County Superior Court Case No.34-2010-80000713**) who had improvidently accepted an untimely Defendants' peremptory challenge. The Defendants had contended that it had not made any appearances before in the matter since the writ petition (**No.34-2010-80000713**) was not continuation of 2007 writ petition ( **07 CS 000360**). That 10-day rule after case assignment did not apply. The Decision of the subsequent superior court (Presided by Hon. Judge Timothy M. Frawley) was null and void, was of no legal consequence and was not enforceable for want of jurisdiction.

(253)  On November 3, 2011, Defendant Linda K Whitney as Executive Director personally prepared, signed and filed Petition to Revoke Probation without serving on Plaintiff while the writ proceedings were still pending in the court.

(254).On January 26, 2012, the Court of Appeal summarily denied writ (**C070040**) in a one line order, without ordering opposition, without affording oral arguments and without issuing a written opinion under California Business & Profession Code Section 2337 and its appellate rules which both violate due process, equal protection of laws and protection of property rights under the 14th Amendment of the U.S. Constitution.

(255) On February 15, 2012 Defendants corrected *nunc pro tunc* its October 27, 2010 order removing psychiatric evaluation. The Corrected Decision to become effective as of March 16, 2012.

(256) On March 14, 2012, the California Supreme Court summarily denied Petition for Review.

**Defendants Revoke without a Notice or a Hearing:**

(257) On August 19, 2012 Defendant Linda K Whitney **without notice or a hearing** sitting as a sole judge and jury acting on her own previously prepared, signed and filed Petition to Revoke Probation, revoked Plaintiff's license for the

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 70

fourth time for not complying with the conditions of probation and reported to other medical boards in State of New York and Pennsylvania, posted the information on "MBC" website for general dissemination nationwide and reported to the National Data Bank.

**New York State Revokes Without a Notice or a Hearing Based on Defendant's Decision**:

(258) On January 19, 2013, the New York medical board revoked Plaintiff's medical license without a notice or a hearing based on Defendants' August 19, 2012 decision to revoke  which was also without a notice and a hearing.

(259) The Pennsylvania Medical Board has noticed Plaintiff with referral proceeding based on Defendants' August 19, 2012 Decision to revoke. The matter was set for hearing in May, 2014. Plaintiff could not appear due to conflict with Jury Summons.

(260) The 2007 order, writ and interloculatory judgment of superior court on writ of administrative mandamus ( **07 CS 00036**)for remand to re-determine penalty consistent with the findings of superior court and 2010 Decision of the Court of Appeal and order for remand to re-determine penalty consistent with the 2007 findings of superior court as was ordered by superior court pursuant to California *Code of Civil Procedure Section 1097* **never became a final judgment** because there never was compliance by Defendants pursuant to 2007 writ, order, interloculatory judgment of the superior court and 2010 Decision and order of the Court of Appeal 3rd. setting aside and vacating revocation and remanding to determine penalty consistent with the 2007 findings of the superior court on the writ petition and there never was entry of final judgment as defined under 28 U.S.C.A § 1257, on the writ petition (Sacramento County Superior Court Case **No.07CS00036**),pursuant to that writ, order, interloculatory judgment remanding to determine penalty consistent with the findings of the superior court in Sacramento County Superior Court  Case No. 07CS 00036 on the writ petition.

(261) Plaintiff is challenging the facial unconstitutionality of the Regulations and Rules of California Court of Appeal <u>in not ordering opposition, issuing alternative writ , providing oral arguments and issuing a written opinion yet considering summary denial of writ petition on merit</u> where extraordinary writ petition is the sole method of review and on facial unconstitutionality of California *Business & Profession Code Section 2327*, as it affects other similarly placed unfortunate physicians who are victims of discrimination or wrongful actions by Defendants and are also equally discriminated by the California Courts as to who gets to have a hearing on extraordinary writ petition. However, Plaintiff is not requesting any relief based on unconstitutionality of Section 2337 since it would not affect the 2007 interlocutory judgment of the superior court upon which defendants could not have determined any penalty. The interlocutory judgment never became final because the most significant part of the writ petition the penalty pursuant to writ's findings was never determined. In other words, there is no final judgment on merit.

(262) Therefore the Plaintiff petitions this Court for the only viable and available remedy: injunctive relief.

## FIRST CLAIM
### (Permanent Injunction)

Plaintiff alleges paragraph 1-262 of this Complaint and re-alleges:

(263) On applying for and receiving a license to practice the profession as a Physician and Surgeon from the State of California, Plaintiff acquired "property interest" in License No. A 24647 protected by United States Constitution.

(264). Having acquired a property interest in License No. A24647, Plaintiff as a citizen of the United States, is entitled to continue to conduct professional practice in conformity with this license free from arbitrary and capricious intrusions or interference by officials of the State of California, including the defendants and persons acting under their supervision or control.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 72

(265).The defendants acting in bad faith and <u>without proper investigation</u> brought **frivolous, false, fraudulent,** irrational and incomprehensible charge of making one wrong diagnosis. Defendants despite repeated requests by Plaintiff, in bad faith declined to meet and confer with their experts to determine the rationality and validity of the Charge of misdiagnosis. Plaintiff has never made a wrong diagnosis and has never been accused of making a wrong diagnosis other than by defendants in 53 years of medical practice.

(266) Defendant's diagnosis of "Acute Thrombosis of Superficial Femoral Artery "was false because it is only a **theoretical diagnosis** and **does not cause any acute clinical symptoms** in any person because the deep branch of the Femoral artery can compensate for any impediment to blood flow which is also overcome by development of 'Collateral blood vessels' around the arterial obstruction.  There are millions of people walking around the streets with complete obstruction of the superficial femoral artery without knowing about it or having any clinical symptoms till they develop obstruction of deep artery.

(267)The Defendants in bad faith conducted a **sham administrative hearing** by irrelevantly trying to prove a false charge of 'misdiagnosis' **based on reading of the arteriogram done before surgery.** Defendants' experts first falsely testified that no clot could be seen on the preoperative arteriogram within the artery.

(268) The Defendants' experts then recanted and testified that 'clot could be present within the artery but they were not sure where a half blind person can see clot within the artery on arteriogram. Furthermore, <u>Plaintiff had **actually surgically removed** the **'embolic clot'** corresponding to the area where 'clot' was visualized on arteriogram as fully documented in the operative report and disputed by Defendants or reading of the arteriogram,</u> insulting [25]intelligence and making a mockery of the peer review process.

---

[25]  Plaintiff is aware of an Iranian surgeon who had removed gall bladder with stones. "MBC" harassed that its experts could not see stones on the ultrasound done before surgery. This surgeon paid one million dollars in attorney fees ($600. an hour) in successfully opposing filing of the accusation against him.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 73

(269).The Defendants admitted in each of its 'Decisions' that **arteriogram did not establish any diagnosis whatsoever** thus destroying Defendants' sole evidence in support of charge of misdiagnosis and **Defendants presented no other diagnostic test in support of its charge of misdiagnosis. Defendants were required to make the finding by law of making a wrong diagnosis based on clear convincing evidence. Defendants had no such evidence.**

(270) Plaintiff's diagnosis was further **confirmed by pathologist on examination of the 'clot'** removed at as 'laminated clot' [layers of clots are successively laid in concentric fashion like layers of onion over period of time] –a description specific and diagnostic of **'embolic clot'** a part of an old clot which had broken off from the bulk of clots in the heart chamber or within aneurysmal sac of aorta and travelled within the blood stream and got stuck where the diameter of the artery decreased at bifurcation of the artery to less than the size of the clot.

(271) The physical appearance of the 'clot' removed from within the artery is well documented in the operative report as **'organized clot'** causing acute obstruction of blood flow and with presence of fresh clots distal to the 'embolic clot' within the artery. This finding of two sets of old and fresh clots is characteristic of old 'embolic clot'.

(272). There was also direct **cause-effect clinical relationship** between the clot, its removal and relief from patient's symptoms. The surgical removal of the 'clot' from within the artery resulted in dramatic improvement of circulation with return of pulses, capillary filling and venous filling as was noted after surgery and documented by nurses and two other attending physicians postoperatively. The defendants' experts failed to explain the improvement in circulation postoperatively if Plaintiff's diagnosis and its treatment were incorrect.

(273) The Defendants' expert admitted on cross examination that out of the two possible diagnoses there was no evidence supporting Defendants' diagnosis and the

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 74

1   physical description of the 'clot' removed at surgery was consistent with **'embolic**
2   **clot' and Plaintiff provided correct treatment for his diagnosis of 'embolic clot'.**
3   (274) After Defendants failed to prove the charge of making one 'misdiagnosis' on the
4   first day of the hearing, defendants became desperate and in bad faith in order to delay
5   and harass kept on making new false charges without evidence and without providing
6   hearing. Defendants started campaign of character assassination by first filing totally
7   false First Amended Accusation charging Plaintiff with fabrication of 'Admission
8   Note' and inserting it into the medical records of two hospitals and making five false
9   statements in relation to such fabrication.
10  (275).  Once the defendants could not prove such false, malicious charges after the
11  Hospital's medical record department testified that Plaintiff had no access to the
12  original medical records and the 'Admission Note' was always present in the medical
13  chart, **Defendants filed another scurrilous Second Amended Accusation at the**
14  **conclusion of hearing, charging making of seven (7) false statements during the**
15  **hearing based on facially false testimony of improperly called rebuttal witnesses**
16  Dr. Garg and patient's daughter **whose testimony had nothing to do with the**
17  **rebuttal of the  Plaintiff's case.**
18  (276) **Defendants by employing hit and run tactics denied opportunity to actually**
19  **litigate the <u>New Charges brought against Plaintiff in the Second Amended</u>**
20  **<u>Accusation</u> and declined to provide a full and a fair hearing and found against**
21  **Plaintiff on six out of seven charges. There was no rebuttal witness or testimony**
22  **on the seventh charge.**
23  (277).The **New Charges** added in the Second Amended Complaint were never
24  actually ligated and there was no full and fair hearing. Defendants never informed
25  Plaintiff in any of the administrative proceedings or in the judicial review of the
26  administrative proceeding when and where in the administrative record Plaintiff ever
27  made the alleged 'one false statement 'that "Dr. Garg would not allow Plaintiff to do a
28  femoro-popliteal bypass on June 10, 2000', This charge of making one false statement

1   was ultimately sustained by Defendants with dismissal of the rest of six Charges of

2   making six false statements as ordered by the court.

3   (278) The Defendants have stubbornly denied hearing on this charge of making false

4   statement in the post remand proceeding in 2007 / 2008 and then in 2010 and declined

5   to drop the alleged false charge without providing evidence in the administrative

6   record.to the Plaintiff or to the court .

7   (279) Plaintiff denies ever making the statement alleged to have been falsely made.

8   (280).The Defendants in their 'Decision' found against the Plaintiff on the Charge of

9   one 'wrong diagnosis'. **The Defendants denied fair hearing when they arbitrarily**

10  **excluded evidence or declined to consider, appraise and rule** on the evidence

11  produced on cross examination of their expert witnesses on the charge of misdiagnosis

12  (281) The expert Dr. Bardin admitted that out of two possible diagnoses there was no

13  evidence supporting Defendants' diagnosis and that Plaintiff made the correct

14  diagnosis and his treatment for his diagnosis was correct. That the clot Plaintiff

15  removed at surgery could not have been produced upstream by distally located the

16  'acute obstruction of superficial femoral artery'.

17  (282) The Defendants decision on the charge of 'misdiagnosis' was unsupported

18  by finding **where Defendants' sole evidence was entirely based on reading of**

19  **arteriogram. Defendants found that arteriogram failed to establish any**

20  **diagnosis whatsoever and defendants presented no other diagnostic test in**

21  **support of its charge or the findings**. Defendants abused discretion as defined

22  under CCP § 1094.5 (b) providing that abuse of discretion is established if the

23  respondent has not proceeded in the manner required by law, the order or decision

24  is not supported by the findings, or the findings are not supported by the evidence.

25  Defendants had no clear convincing evidence to support the finding of

26  misdiagnosis as required by law.

27  (283) Plaintiff denies making any alleged wrong diagnosis and denies ever making

28  a wrong diagnosis in 53 years in the medical profession.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION – 76

(284) Defendants admitted in each of their **'Decisions'** that there was no penalty for single act of negligence' such as making one wrong diagnosis.

(285).The defendants having failed to prove the documentation charges as alleged in the Accusation, **in bad faith** inserted into its Decision, frivolous, false **New Charges / Findings on Documentation, without a Notice, Accusation, Trial or Proof or without actually litigating and providing a full and a fair hearing.**

(286) The Defendants denied fair hearing when they included Prosecutor into their deliberations after oral arguments were concluded by attorneys in 2006.

(287). In the writ proceedings, Defendants misled the Sacramento superior court under the presumption of correctness of their 2006 decision that Plaintiff made a false statement even though the California superior court in a writ petition dismissed five out of six **facially false charges** of making false statements. The writ petition is the appellate review of the administrative record of the hearing. Plaintiff never had a hearing on the "SAA" and there could not be any appellate review of any issue not tried in the administrative proceeding.

(288)The superior court found against Plaintiff on one charge of making false statement without making a finding when and where in the administrative record Plaintiff made the statement alleged to be made falsely.

(289) The superior court could not and did not make a **finding of 'moral turpitude'** or **'intentional dishonesty'**-a finding necessary for imposition of any penalty. The superior court did not order any remand for a hearing on the false statement charge that

> "Dr. Garg would not allow Plaintiff to do a femoro-popliteal bypass
> on June 10, 2000".

**Plaintiff made nowhere in the entire administrative record the alleged statement.** Furthermore, Dr. Garg never testified at the hearing on this Charge.

(290) The Charge was false because Dr. Garg testified at the hearing contrary to the Charge that the leg was dead on June 10, 2000. **Dr. Garg could not have rationally told Plaintiff to do a femoro-popliteal bypass on a dead leg.**

(291) Nonetheless, this single **New Charge** was not actually litigated, and Defendants denied a full and a fair hearing. Since Defendants never provided a hearing, Defendants proved nothing. Defendant could not and did not make a finding of 'moral turpitude' or act of 'intentional dishonesty' in making the alleged one false statement.

(292) Under California decisional law Defendants could not determine any penalty in the absence of finding of 'moral turpitude' which the Defendants or the court never made.

(293).Defendants misled the superior court under strong presumption of correctness on documentation charges which were inserted into their Decision by defendants **without a notice, accusation, trial or proof.**

(294)These charges were never actually litigated and Plaintiff was denied a full and a fair hearing. Defendants under California decisional law could not lawfully determine any penalty on charges not alleged in the accusation and bootstrapped into decision

(295).Defendants misled the superior court when they claimed strong presumption of correctness on charge of misdiagnosis. Defendants in opposition to writ petition could not and did not **oppose, binding admissions** by their experts on the charge of misdiagnosis and presented no other diagnostic test in support of its diagnosis.

(296)The superior court made no mention in the ruling of the lead argument by Plaintiff's attorney in writ petition of the binding admissions by Defendants' experts on the correctness of Plaintiff's diagnosis.

(297).Defendants in opposition to writ petition pled two grounds for making a finding of **'repeated and gross negligence'** and **'repeated and gross incompetence'**.

(1) **Improper transfer** of patient from San Antonio Community Hospital to Pomona Valley Hospital.

(2) Making a **wrong diagnosis**.

(298)The superior court dismissed the charge of improper transfer of patient. The superior court could not and did not uphold Defendant's finding of '**repeated and gross negligence' and 'repeated and gross incompetence'.**

(299) The superior court set aside and vacated Defendants' 2006 Decision and remanded for redetermination of penalty consistent with court's findings on submitted matters on the writ of administrative mandamus.

(300) The Defendants could not lawfully determine any penalty based on findings made by superior court.

(301) The Defendants in **bad faith** on remand disobeyed writ, order and inter-locutory judgment of the superior when defendants made a new 2008'Decision' which was nothing but a *word by word, paragraph by paragraph, page by page* plagiarized and recycled copy of their set aside and vacated 2006 Decision, retaining in full their findings of 'repeated and gross negligence' and 'repeated and gross incompetence' and revoked medical license.

(302) Defendants in **bad faith** harassed and delayed for one year on remand only to recycle their set aside and vacated 2006 Decision as 2008 Decision.

(303) Defendant's 2008 Decision was unsigned by any board members and was without a procedural history of when and if Defendants reviewed the evidence, transcripts and record of the hearing personally and made the new 2008 decision as required under *California Government Code* 11517 (b) (2).

(304) There was no evidence that any Administrative Law Judge presided over the hearing or the decision making process as is required under *California Government Code* § 11517(b) (1).

(305) Defendants in disobedience of the court's findings reinserted 'findings of 'repeated and gross negligence' and 'repeated and gross incompetence' just based on making of alleged one wrong diagnosis in violation of California Business & Profession Code § 2234 (c) (1) where Defendants' expert testified that Plaintiff's

treatment of his diagnosis was correct. Defendant did that in order to justify revocation.

(306) Defendants denied fair hearing by not appointing impartial decision makers when they included board members on the 2006 hearing panel whose decision had been set aside and vacated by the superior court into the 2008 hearing panel.

(307) Defendants use progressive discipline. Plaintiff had no prior history of discipline by any hospital or board. Plaintiff is the only physician who was revoked straight off four times for allegedly making a wrong diagnosis.

(308).On February 22, 2010, the California Court of Appeal 3rd **set aside vacated the Defendant's 2008 'Decision'** and remanded to re-determine penalty consistent with superior court's findings of August 10, 2007 pursuant to California Code of Civil Procedure § 1097.

(309) **The Court of Appeal found that dismissed findings by superior court of improper transfer of patient causing unnecessary delay changed the <u>factual</u> and <u>legal</u> basis of the 'Decision'** [from repeated negligence to single act of negligence of making one wrong diagnosis thus ruling out any penalty] and ordered that remand <u>was limited to determination of penalty</u> consistent with the findings of the superior court on writ petition. [Not to make findings] and ordered to provide oral arguments. The Court of Appeal 3rd would not have set aside and vacated the Defendant's 2008 decision just for a harmless error.

(310) The Court of Appeal 3rd agreed with the argument made by Plaintiff in his brief that Defendants could not lawfully determine any penalty on making a wrong diagnosis and ordered remand to re-determine penalty consistent with the findings of the superior court on writ petition after making a finding that dismissal of Charge of improper transfer changed legal and factual basis of 2008 Decision.

(311). On October 27, 2012 ,the Defendants in contempt of the court for the second time disobeyed writ ,order and interloculatory judgment of the superior court and

the Order of the Court of Appeal 3rd to determine penalty consistent with the 2007 findings of the superior court on writ petition.

(312) Defendants disobeyed because Defendants could not lawfully determine any penalty consistent with the findings of the superior court on writ petition.

(313) Defendants admitted in their Decisions that there is no penalty for single act of negligence of making one wrong diagnosis as stated above.

(314) In order to revoke, Defendants **in bad faith** in disobedience of the Court of Appeal's Order not to make findings once again recycled findings of '**repeated and gross negligence' and 'repeated and gross incompetence'** which had not been upheld by superior court and the Court of Appeal 3rd.

(315) Defendants **in bad faith** for the second time recycled *word by word, paragraph by paragraph, page by page* its set aside and vacated 2006, 2008 Decisions as 2010 Decision, retaining in full its legal and factual basis of 2006, 2008 Decisions which the Court of Appeal 3rd had found had changed.

(314) Defendants denied fair hearing by not appointing impartial decision makers when they included members of the hearing panels on 2006 and 2008 whose decision had been set aside and vacated by the Court on the 2010 hearing panel.

(315). Defendants could not determine any penalty based on bare finding of making a false statement **without a finding of 'moral turpitude'** or 'intentional dishonesty' as defined by California Supreme Court.

(316)The Defendants and the superior court had not made any finding of moral turpitude because there was no trial on this absurd charge and no evidence of moral turpitude or intentional dishonesty was ever presented.

(317)No evidence was ever presented when and where Plaintiff ever made the alleged statement at all let alone made falsely. Plaintiff had not made the alleged statement falsely anywhere in the entire administrative record as stated repeatedly above and Defendants proved nothing let alone a finding of 'moral turpitude'. (" *re Helliman* (1954) (Calif. Supreme Court) 43 Cal. 2d 243 247-248; 272 P 2d 768)

(318) Defendants <u>could not lawfully determine any penalty based on bootstrapped documentation charges into the Decision</u>, <u>without a notice, accusation, trial or proof pursuant to California decisional law.</u> (***Wheeler v State Board of Forestry*** (3rd Dist. 1983) 144 Cal. App. 3d 522,192 Cal. Rptr. 693) These charges were never actually litigated since there never was a full and a fair hearing as stated above.

(319) Defendants begrudgingly reinstated medical license as of 2006 since the writ petition resulted in setting aside and vacating 2006 and 2008 Decisions. The Defendants in bad faith instead conveniently recycled their set aside and vacated 2006 and 2008 Decisions for the second time as 2010 Decision in order to illegally place Plaintiff on probation after making a finding **that it was safe for Plaintiff to practice medicine.** Plaintiff had done nothing wrong to begin with.

(320) Business & Profession Code Section 2229 (a) provides that protection of the public shall be the highest priority for the Division of Medical Quality in exercising its disciplinary authority, yet **without cause** Defendants illegally determined penalty under subsection Cal. B.P § 2229 (b) providing that in exercising its disciplinary authority the Division of Medical Quality shall, wherever possible, take action as is calculated to aid in the rehabilitation of the licensee.

(321) Rehabilitation under Cal. B.P. Section 2229 Subsection (b) was irrelevant because Plaintiff was not even threat to the patient (GF) in question 14 years ago let alone threat to the general public14 years later. Plaintiff had restored pulses in the leg after each surgery

(322)The rehabilitation is only indicated if the physician is found to be unsafe to practice medicine pursuant to B.P. § 2229 Subsection (a). There was nothing to rehabilitate, Plaintiff had done nothing wrong whatsoever. Nevertheless instead of rehabilitating Plaintiff Defendants have repeatedly injured Plaintiff.

(323) Defendants in bad faith ordered that Plaintiff take expensive and extensive clinical courses; pass an examination by UCSD; prohibited solo practice of medicine;

monitored all medical charts quarterly and billing; restriction on supervision of physician assistant; restrictions on travel. Defendants **in bad faith** ordered that Plaintiff should be on probation in the foreign state if he chose to practice there. Defendants knew that Plaintiff had active, current, unrestricted medical license in Commonwealth of Pennsylvania and **in bad faith** required Pennsylvania medical board to place Plaintiff under probation. Defendants in bad faith ordered ethic courses and courses on documentation to be repeated several times during the year for five years.

(323) Defendants in order to annoy, vex and harass in **bad faith** ordered psychiatric examination because Plaintiff had filed writ petition. Defendants violated Plaintiff's right under First Amendment to petition courts. Defendants constantly harassed Plaintiff to make appointment with psychiatrist.

(324) Plaintiff filed writ petition and request that Defendants should be found in contempt. The court got tired of and just gave up and declined to enforce its own decision. The courts did not want to confront another branch of the same government of which the courts were part of. However, the superior court set aside and vacated requirement of psychiatric examination unless every attorney was required to undergo psychiatric examination.

(325) On March 2012, the supreme court of California denied petition for review. At that point, Plaintiff had exhausted all available administrative and judicial remedies on 2010 Decision.

(326) **On August 19, 2012, Defendant Linda K Whitney acting as a judge and jury in bad faith acting revoked Plaintiff's medical license without a Notice or a hearing.**

Defendant Whitney acted upon her Petition to Revoke Probation which was previously prepared, signed and filed by her on November 11, 2011. Defendant Whitney notified New York and Pennsylvania medical boards where Plaintiff was licensed.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 83

(327)The 30 day statutes of limitation to file writ petition under California law on Whitney's revocation of probation expired long before Plaintiff found out through Pennsylvania medical board, the actions taken by Defendants on August 19, 2012. <u>Plaintiff could not exhaust a remedy which was not available.</u> (***Westlake v Superior Court Westlake v Superior Court*** (Supreme Court  of  California 1976) 17 Cal. 3d 465, **478**; 551 P.2d 410, 417; 131 Cal. Rptr. 90; 1976 Cal. LEXIS 298 )

(328) Nonetheless, any writ petition on revocation of probation would not have served any purpose as long Defendants' unlawful 2010 Decision placing on probation remained unreversed.

(329) On September 25, 2012 Plaintiff filed the present Complaint in the district court to vacate probation. Once the penalty of probation is vacated, the issue of revocation of probation would become moot.

(330) The  2007 Order, Writ and interloculatory Judgment of the superior court on writ of administrative mandamus ( Sacramento County Superior Court Case No. **07CS00036**) and the 2010 order of the Court of Appeal 3rd were never satisfied and enforced.**There is no Final Judgment** on merit pursuant to the 2007 order, writ and interloculatory judgment of superior court.

(331) The Defendants have repeatedly disobeyed writ because it could not legally determine any penalty based on 2007 findings of the superior court on the writ petition. **The district Court has no appellate jurisdiction of the state court's proceedings but instead conducts de-novo review of the entire matter.**

(332). Plaintiff suffered extreme financial, emotional injuries and professional hardships and all to his detriment for the prejudicial acts of the defendants.

(333) Defendants **in bad faith** and in retaliation for filing writ petition have converted the initial penalty of revocation of 2 years into 8 years of revocation by their delaying and harassing tactics and by disobeying orders of the courts. The Defendants are incompetent for 'bias.'

(334). In light of the deprivations of repeated denial of fair hearing which resulted in discipline by disobeying writ of the court and disciplining, Plaintiff has absolutely no adequate remedy at law, which would restore Plaintiff's active, unrestricted medical license as he held prior to January 2007, since the State courts are completely ineffective in correcting the deprivations and declined to enforce its own decision and declined to find Defendants in contempt.

(335) The court finally gave up and excused itself from not enforcing its order (**34-2010-80000713**),instead providing that the second writ petition was not continuation of original 2007 writ petition (**07CS00036**) and Plaintiff did not seek relief under that writ petition number. (*Supra*¶ 247*)

(336) The prior superior court judge had specifically ordered that if Plaintiff was dissatisfied with the Defendant's Decision on second remand in 2010, Plaintiff **could file a supplemental or a new writ petition and that was exactly what the Plaintiff did.** (*Supra* ¶ 224)

(337) Plaintiff spent about $ 300,000 in legal fees and cost till 2008 alone to get hearing on writ petition and twice succeeded in getting Defendant's 2006, 2008 Decision set aside and vacated yet still there is no Final Judgment in accordance with 2007 writ, order of the superior court and 2010 order of the court of appeal.

(338)The issues were never actually litigated and there was no full and a fair hearing. Had the Defendants followed the 2007 order and writ of the superior court, Plaintiff's medical license would have been restored in 2007.

(339). Defendants took the action without proper investigation, declining to meet and confer with experts and without reasonable belief that the action was in the furtherance of quality health care, without reasonable effort to obtain the facts of the matter, adequate notice and hearing procedures are afforded to the Plaintiff or after such other procedures as are fair to the physician under the circumstances as required pursuant to *42 U.S.C. § 11112*.

(340)The defendants are obstinate transgressors of Plaintiff's right to full and a fair hearing and right to litigate charges on merit and petition court. Defendants in order to injure Plaintiff have declined to obey the orders of the court in seven (7) years of litigation.

(341). On January 19, 2013, based on defendants' August 19, 2012 Decision to revoke without a notice or a hearing, the Plaintiff's medical license in N.Y. was revoked without a notice or a hearing. The Pennsylvania medical board has also initiated disciplinary proceeding against Plaintiff based on the same defendants' August 19, 2012 Decision to revoke without a notice or a hearing. The referral matter in Pennsylvania is pending.

(342) In the absence of relief by this court Plaintiff will be subjected to multiplicity of proceedings in Pennsylvania and New York and will cause irreparable harm and serious monetary, emotional injuries and further loss of reputation and further loss of standing in the community.

(343).As a proximate result of the illegal actions of defendants alleged above Plaintiff has been damaged in that Plaintiff has been deprived of his medical license and right to earn a livelihood and has suffered a loss of income, reputation, standing in the community and opportunity to pursue his chosen profession and will continue to suffer extreme financial, emotional, and professional hardships and to his detriment.

(344) Plaintiff will be irreparably harmed. The public interest would not be affected as defendants already found that it would not be against public interest if Plaintiff resumed practice. Balance of equities tips in Plaintiff's favor as Defendants have repeatedly delayed and harassed and disobeyed the writ, order and interlocutory judgment of superior court .Plaintiff has no adequate remedy of law.

 In light of the above facts, only a permanent injunction will affect the restraint of the defendants from injuring Plaintiff.

## SECOND CLAIM

**Permanent Injunction for Unconstitutional Statute**
**Facial Unconstitutionality of California Business & Profession Code 2337 and**
**Rules of California Court of Appeal)**

Plaintiff re-alleges and incorporates by reference the paragraphs 1-344 of this complaint and alleges:

(345). *California Business & Profession Code Section  2337,* is facially unconstitutional in part where it provides that the review of the superior court's decision shall be pursuant to a petition for an extraordinary writ disallowing direct appeal from the decision of the superior court on the writ of administrative mandamus.

(346) The statute is unconstitutionally vague and overbroad and provides courts basis to abuse discretion or discriminate and Section 2337 can be used as a device to control Court of Appeal's dockets and summarily deny meritorious extraordinary writs without justifying their decisions with a written opinion.

(347) Section 2337 promotes lack of transparency and accountability which can hide denial of due process to physicians injured by the medical board.

(348) Section 2337 has no benefit and where less burdensome alternatives such as fast tracking of appeal exist.

(349) Section 2337 encourages medical board and superior court to show deliberate indifference or abuse discretion due to freedom from procedural safeguards for lack of proper review on appeal hammering out all issues by briefing, oral arguments and a written opinion justifying the decision.

(350) Under Section 2337 and California Appellate Rules, a lack of written opinion justifying decision also deprives physicians of a Petition for Review by the California Supreme Court. The Supreme Court only reviews from a written opinion of Court of Appeal.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION  –  87

(351) Section 2337 denies **equal protection of laws**, since it treats physicians differently from other appellants appealing garden variety cases for breach of contract cases over $ 25,000 who are similarly situated in an unequal manner.

(352) Section 2337denies due process and is in conflict with the U.S. Constitution and absence of Statutes authorizing appeal may constitute lack of adequate remedy at law and irreparable harm.

(353) The Rules of the California Court of Appeal are also facially unconstitutional providing for discretionary summary denial of physician's petition writ of mandate without ordering Opposition, issuing alternative writ, affording oral arguments and issuing a written opinion justifying the decision, precluding transparency and accountability of the proceedings and full adjudication of constitutional claims and rights, as for an example in this case the Court of Appeal summarily denied discretionary review by extraordinary writ  on the finding of making one untruthful statement to stand where there Charge was **never actually ligated** and there never was a **full and fair hearing** and where Defendants never informed Plaintiff when and where he made the alleged 'false statement' and there was no evidence in the entire administrative record that Plaintiff ever had made the alleged false statement and also denied review of bootstrapped documentation charges inserted into the Defendant's Decision without an accusation, notice, hearing or proof. This would not have happened if direct appeal was available.

(354)The entire California Appellate process under Section 2337 and its Appellate Rules do not have any semblance of fairness and equity by precluding direct appeal thus denying physicians full and fair review and equal protection of laws. It offers no benefit and less burdensome alternatives such as fast tracking the appeal which already exist for other appeals. The public interest would not be harmed and in absence of relief irreparable harm is caused.

(355) Nonetheless, Plaintiff is not challenging the Statutes as applied or complaining of any injuries caused by the courts. Instead, Plaintiff is only

complaining of injuries caused by defendants in misleading courts, disobeying writ, determining penalty based on issues not actually litigated and providing a full and a fair hearing and making a finding of misdiagnosis unsupported by substantial evidence and preventing a final judgment on the writ petition.

(356) Plaintiff seeks injunction prospectively for the sake of other similarly placed physicians who would be adversely affected by Section 2337. Attack on Section 2337 in Plaintiff's case would not affect interloculatory judgment which the Defendants have repeatedly disobeyed and upon which Defendants could not determine any penalty.

(357).The plaintiff prays, that Court declare California Business & Profession Code § 2337 unconstitutional and grant Permanent Injunction against it.

# PRAYER

The Plaintiff petitions this Court to grant the following relief:

   A. Following a full hearing on the claims raised here, issue its permanent injunction permanently restraining and enjoining defendants from imposing any disciplinary action or penalty against the Plaintiff as follows;
   *AGAINST* Defendant Kimberly Kirchmeyer and Defendant Sharon Levine In their **Official capacities** in favor of Plaintiff
   (1) Against any Prospective Enforcement of 2010 order of Probation and 2012 Order of Revocation.
   (2) For Prospective Reinstatement of California medical license.
   B. *AGAINST* Defendant Linda K Whitney, Defendant Kimberly Kirchmeyer and Defendant Sharon Levine in their Personal, Individual Capacities and in favor of Plaintiff
   (1) Against any Prospective Enforcement of 2010 order of Probation and 2012 Order of Revocation.

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 89

(2) For Prospective Reinstatement of California medical license.

(3) For Retrospective Relief providing that

    (i)    Plaintiff never made a wrong diagnosis.

    (ii)    Plaintiff never made the alleged false statement.

    (iii)    Plaintiff never had a hearing on Charge of making a false statement as alleged in the Second Amended Accusation.

    (iv)    Defendants inserted new findings on 'documentation' into their 2010 Decision without a Notice, Accusation and providing a Hearing or any Proof.

    (v)    Restoration of unrestricted medical license as it existed prior to 2007.

    (vi)    Expunge Record of filing of Accusation, First and Second Amendment Accusation and of Probation and Revocation.

    (vii)    Expunge record of any disciplinary proceedings against Plaintiff from website maintained by Defendants and

    (viii)    Expunge notifications to N.Y. State Medical Board; Pennsylvania Medical Board and National Data Bank.

**C.**    **For Declaratory Relief as follows:**

    (i)    Adjudge and declare Plaintiff's rights that Plaintiff was entitled to hearing on the Second Amended Accusation on the Charge of making one false statement.

    (ii)    Adjudge and declare Plaintiff's rights that Defendants could not insert new Documentation Charges / findings into their 2006 Decision and could not determine any penalty based on charges inserted into decision without a notice, accusation, hearing and proof.

    (iii)    That Plaintiff was entitled to a Notice and a full and a fair hearing on any charges upon which penalty was based.

(iv)     Adjudge and declare that Plaintiff was entitled to Notice and a Hearing on the Defendants August 19, 2013 action revoking medical license without a notice or a hearing.

(v)      Adjudge and declare that California Business & Profession Code Section 2337 is facially unconstitutional because it is vague, over broad, does not provide the same procedural protection, equal protection of laws and due process guarantees enshrined in U.S. Constitution, the scrutiny, transparency, accountability as is available on appeal to other appellants with small matters such as breach of contract in a sum more than $ 25,000 where physicians' life-long investment in their medical licenses, entire livelihood and reputation is at stake.

(vi)     Adjudge and declare that Regulations and the Rule of Court employed by California Court of Appeal in not ordering opposition, issuing an alternative writ, affording oral arguments and written opinion in matters where review by extraordinary writ is the sole method of review and declaring summary dismissal as on merit without a written opinion justifying the reasons for the opinion as facially unconstitutional. That any summary denial by court of appeal under such circumstances cannot be on merit.

(vii)    Grant all other relief that is just, fair, and equitable, including , but not limited to, award of attorney's fees  with interest incurred by Plaintiff in maintaining actions to this date to protect his constitutional rights, as provided for in 42 U.S.C. § 1988.

Date: July 9, 2014

_____

JEHAN ZEB MIR, MD

*Plaintiff pro-se*

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION - 91

# VERIFICATION

I am the Plaintiff in the above entitled action. I have read the foregoing Complaint and know the contents thereof. The same is true of my knowledge, except as to those matters which are therein alleged on information or belief and as to those matters, I believe it to be true.

   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 9th Day of July, 2014, at Redondo Beach, California. 90277

_____
Jehan Zeb Mir, MD
Plaintiff-pro-se

THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION – 92

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jehan Zeb Mir,MD | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| Kimberly Kirchmeyer,et al. | ) |
| | ) |
| | ) |

Case No. 12 CV-2340-GPC-DHB

**DECLARATION OF SERVICE**

Person Served:
Margaret Jaramilla Phe

Date Served:
07/09/14

I, the undersigned declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; that I served the above named person the following documents:
THIRD AMENDED COMPLAINT
in the following manner: (check one)

1)       By personally delivering copies to the person served.

2)        By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to ther person served at the place where the copies were left.

3)        By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

4)      ✗      By placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at Los Angeles,CA
                        on        July 9       , 20 14                        .

Executed on        July 9        , 20 14        at Redondo Beach, CA

::ODMA\PCDOCS\WORDPERFECT\14560\2 May 5, 1999 (10:01am)